KREHER et al. v. UNITED STATES.

No. 47413.

United States Court of Claims.

Decided Jan. 3, 1950.

Robert C. Handwerk, Washington, D. C., for plaintiffs.

Kendall M. Barnes, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The Tampa Shipbuilding & Engineering Company, hereinafter sometimes referred to as the "company" or the "old company," was dissolved June 1, 1945, and its directors became trustees thereof. At the time of dissolution the company had six directors. Only three of the six trustees joined in instituting and prosecuting this suit. See Finding 3. The remaining three trustees were alive and active at the time the case was heard and submitted. There is no evidence that a majority of the trustees voted to authorize the institution of this suit.

At the time of the filing of the original and amended petitions, H. S. Phillips, one of the trustees, was, and now is, United States District Attorney at Tampa, Florida.

J. W. Gray was one of the directors of the old company and became a trustee thereof upon dissolution. He was appointed treasurer of the company in January 1939 and was elected a director shortly thereafter. At the time of his appointment as treasurer, Gray was an employee of The Exchange National Bank of Tampa and was appointed to this position upon the recommendation of the bank. Gray remained with the new company (the Tampa Shipbuilding Company, Inc., which, in November 1940, acquired all assets and assumed all liabilities of the old company) and ultimately received 750 shares of the voting stock of the new company which he sold in 1945 for $150,000 in cash. .

The plaintiffs' corporation, the Tampa Shipbuilding & Engineering Company, was organized in 1917. In 1938 the defendant advertised for bids for the construction of certain ships for the Maritime Commission. The bid submitted by this company for four ships was accepted and, on May 21, 1938, the company and defendant, acting through the Maritime Commission, entered into four contracts each of which called for the construction of one C-2 freighter, the four vessels being known as Contractor's Hull Nos. 33, 34, 35, and 36. All of the contracts were identical, with the exception of the hull numbers and the dates specified for beginning and completing the ships.

As set forth, in detail, in the findings, the Tampa Shipbuilding & Engineering Company borrowed $2,403,000 from the Reconstruction Finance Corporation, in which loans The Exchange National Bank of Tampa had participated to the extent of $200,000. Without these loans the company could not have obtained these contracts or undertaken the work of constructing the ships. Prior to May 21, 1938, the date on which the company was awarded the four ship contracts above mentioned, the Reconstruction Finance Corporation and The Exchange National Bank had loaned the company $1,503,000 secured by bonds and mortgages of the company. The R. F. C. made a further loan of $35,000 to the company in April 1939. In addition to these loans it became necessary, in December 1938, for the company, in order to provide additional working capital, to arrange with its suppliers of steel and engines for the four ships to permit the company to retain 20 to 25 percent of their vouchers until an aggregate of $100,000 had been so retained from each supplier; and, also, to arrange with the Maritime Commission to modify Article 20 of the contracts with the Commission so as

to provide for weekly payments of 95 percent of work done and materials delivered, including work done by the manufacturer of engines for the ships. Article 20 of each contract originally provided for nine partial payments, each in the amount of 10 percent of the contract price, to be made as each ship reached specified states of completion, the final payment of 10 percent to be made after acceptance of the vessel.

In the conduct of the negotiations for the loans, hereinbefore mentioned, aggregating $1,503,000, and the issuance of the necessary performance bonds required by the defendant, the company secured the assistance of George B. Howell, the trust officer of The Exchange National Bank of Tampa. It was largely through the assistance of Howell that the company was able to arrange for the necessary financing with the R. F. C.; the suppliers of steel and engines, and the Maritime Commission, for more liberal progress payments. Howell, who was an official of the Tampa Chamber of Commerce, rendered this assistance to the company largely because of his interest in the well-being of the city of Tampa and in establishing, if possible, a large and successful shipyard there. He had assured the R. F. C. that he would continue his active interest in the affairs of the company; its performance of the Government contracts, and the repayment by the company of the principal and interest of the loans made to it. He kept this promise. Howell was not an officer or stockholder of the Tampa Shipbuilding & Engineering Company. Of the 6,700 shares of stock of the company outstanding, 4,580 shares were owned by the three plaintiffs herein.

Some time prior to December 21, 1938, when the supplemental agreements, abovementioned, were made with the company's steel and engine suppliers and with the Maritime Commission, the Commission had had a thorough investigation made by one of its representatives of the company's operations and its internal business organization, and a written report, which was somewhat critical of the company's organizational staff, had been submitted. An organization chart had been submitted with the report, which report stated, in part, as follows:

"This Chart is simple, direct, and consistent with the present situation and layout of the plant of that corporation.

"It avoids, except in one or two unimportant particulars, any overlapping of activities, and is so arranged as to use to the best advantage such qualified personnel as this corporation may have at present employed.

"In the rectangles intended for the name of the department or division heads I have filled in such few names as can be confidently so included without any serious possibility of discussion or argument.

"Other divisions are at present filled but only temporarily, but many of those shown are not filled at all, or else have not been definitely defined and the duties were discharged [or] are being discharged in an indefinite manner without direction and official allocation from the executive authority.

"The Organization Chart in question is not a classification of the present organization. There is no Organization Chart of the present organization and this organization itself is of such a loose and overlapping nature that it would be difficult to diagram it.

"In my opinion this is a condition which should be corrected in the very early future and in general, along the channels suggested by the enclosed Organization Chart.

"In my opinion there need be no immediate concern regarding the filling of the minor positions shown as many of these suggestions can be filled from present personnel who are exercising in various degrees the functions of the positions themselves, and the remainder will be attended to when the basic organization is directly arranged and competent heads are appointed or hired where not available for the major departments.

"* * * * * *

"At the present time there is no Division in this Yard which can be definitely regarded as plant maintenance; there is no definite Division of production control; there is no adequate routing and scheduling control; there is no definite personnel office charged with the unescapable responsibility of such an activity; the work of purchasing and custody is not coordinated and organ-

ized as it should be; machinery activities, as grouped, are not co-ordinated and present control is certainly not what it should be; there is no definite co-ordination and control of the interior activities involved in structural fabrication; there is no co-ordination and definite control of the exterior activities involved in hull construction.

"In several instances I have been unable to find that there is any preparation for the co-ordinating of activities referred to, or any intention of providing the necessary executive personnel for their effective control. I may say in particular, that I cannot but regard as unsatisfactory the present arrangements for plant maintenance and for production control, with practically all of the main elements involved in this latter division. Personnel control involving building up of the force at this yard; the provision of lists from which to get additional workers on short notice; the contracts with maintenance of proper relations with labor unions; and the maintenance of the proper records for production purposes, as well as for the meeting of legal requirements of the Federal and State government, is, in any sense of a satisfactory approach to the subject, practically non-existent. The results are as would be expected, including accumulating difficulties with the labor unions which unquestionably threaten serious future events unless corrected."

During the negotiations by the company, through Ernest Kreher, its president and general manager, concerning the supplemental agreements, the conditions discussed in the above report concerning the company's supervisory personnel, were discussed by the Commission with Kreher, and an organization chart for the company was also discussed and prepared. The chart first prepared was not agreed to by Kreher. A second organization chart was then prepared and agreed to by both parties, and such chart was approved and agreed to by the company, in writing, as follows:

"An organization chart identified by the signatures of representatives of the parties has been prepared and discussed between us and is agreed to as setting forth a proper and necessary organization for the performance of the contracts. We will undertake to bring about a prompt compliance with said organization chart and to fill all positions shown thereon as there indicated and with competent men as soon as such men are needed for the work who shall have the duties, responsibilities, and authority appropriate to their several positions.

"In filling the office of treasurer we have been assured of the cooperation of our bank in obtaining a qualified man who shall be the chief financial and accounting officer, shall report directly to the president, shall have charge of the office staff and be empowered to employ on our behalf such financial, accounting, and office help as may be necessary. He shall pass upon the terms of payment on all purchase orders and no additions or improvements to plant shall be undertaken or committed for without his approval."

This organization chart contained the names of the persons, including the treasurer, to be considered for appointment to the positions indicated thereon and they were subsequently so appointed by the company. The company and Mr. Howell, of The Exchange National Bank of Tampa, agreed upon J. W. Gray, an employee of the bank, for the position of treasurer. The organization indicated in the chart was put into effect and the appointments indicated thereon were made by the company early in January 1939.

At all times prior to the appointment of Gray as treasurer, the R. F. C. required that all checks issued by the company be countersigned by The Exchange National Bank of Tampa, but this requirement was waived when Gray became treasurer.

In the summer of 1939 the Maritime Commission advertised for competitive bids for the construction of additional C–2 freighters of the same type as those then under construction by the company. The company submitted a bid upon this invitation, and was awarded contracts for the construction of four additional vessels. On November 21, 1939, prior to the execution of these contracts, the chairman of the Maritime Commission addressed the following letter to the company:

"The Maritime Commission is prepared to sign contracts with Tampa Shipbuilding

and Engineering Company for four additional C-2 vessels, as awarded September 23, 1939.

"In the present C-2 contracts which the Commission has with your Company there is a proviso that the management of the Company must at all times be satisfactory to the Commission. The proposed contracts for the four additional vessels carry a similar proviso.

"In the opinion of the technical staff of the Commission there is a lack of coordination and of proper planning in the scheduling of the work at your yard which seriously interferes with progress of the work. The Commission, therefore, feels that it is necessary that some capable person, satisfactory to the Commission and with authority satisfactory to the Commission, be selected to be in complete charge of the organization of the plant as well as of the planning, scheduling, and construction of all vessels under contract for the Maritime Commission. It is believed by the Commission that it is doubtful if a person capable of filling this position satisfactorily can be obtained for a salary less than approximately $10,000 per annum.

"Please indicate by signing a copy of this letter that you understand fully that the present contracts are being executed with the understanding that the above requirements will be carried out by your Company immediately."

The company endorsed its acceptance upon a copy of this letter and returned it with such endorsement to the Commission. It is obvious from this letter that the Maritime Commission was not satisfied with the way in which Ernest Kreher, the president of the company, was handling the construction work as general manager.

The contracts for these four additional ships were executed by the parties on November 27, 1939, as of October 25, 1939, and were substantially identical to the prior contracts, with partial payment clauses of the type which had been added by the supplemental agreements of December 31, 1938. Each of these contracts contained the following clause, differing only as to dates: "The work of constructing the vessel shall be commenced on or before November 1, 1939, shall be prosecuted with due diligence, and shall be completed and delivery of the vessel (in all respects complying with the terms of this contract and the plans and specifications) shall be made on or before May 23, 1941. *To this end the management and operating organization of the Contractor shall at all times during the period of this contract be satisfactory to the Commission.*" [Italics supplied.]

In connection with these contracts, the R. F. C. on December 19, 1939, authorized a further loan to the company in the amount of $900,000. Of this sum, $250,000 was to be used to expand the company's facilities, $150,000 was to be made immediately available as working capital, and the remaining $500,000 was to be held in reserve until it was needed as additional working capital. These funds were required to be segregated in a separate account, available only for the four vessels covered by this group of contracts.

In addition to this loan, the R. F. C. had, on April 26, 1939, made an additional loan of $35,000 to the company, applicable as hereinbefore stated, to the construction of the first four vessels. This brought the company's total liability to R. F. C. to the principal sum of $1,903,000, excluding the $500,000 "reserve," or $2,403,000, including that amount.

On December 20, 1939, the Chairman of the Maritime Commission wrote to the company as follows:

"At the time of the signing of the contracts for the four additional ships the Commission notified you that it was not satisfied with the management at your plant and would insist upon a change and upon the selection of a General Manager to properly organize the yard and expedite the work of completing your contracts.

"The Commission has investigated a number of men, seeking to find a suitable one for this position. However, for one reason or another they either were not acceptable to the Commission or not available.

"However, the Commission finds that Mr. P. B. Brill, presently attached to our staff is available and he is acceptable to the Commission. It is therefore suggested that you

write Mr. Brill and make arrangements for his employment, if he is satisfactory to the Tampa Shipbuilding and Engineering Company. The Commission is willing to approve his salary in the amount of $10,000 per annum, for the position of General Manager under our agreement with the Reconstruction Finance Corporation.

"The Commission can ill-afford to spare Mr. Brill's services at this time. However, due to the necessity of reorganizing your plant, and in order to expedite the construction of the vessels presently under contract, the Commission is prepared to handicap itself by the release of Mr. Brill's services in order that he may enter your employ.

"It is requested that you take immediate steps to negotiate with Mr. Brill as hereinabove outlined, if his employment is acceptable to you."

The record is not clear as to just what happened, but the Company did employ Mr. Brill as its general manager shortly thereafter.

Throughout the year 1940, as the company continued the construction of these vessels, its financial position became increasingly precarious. This was not due to anything which occurred in 1940, but was simply a continuation of events which started in 1938, when the company first agreed to build vessels for the Maritime Commission.

The first ship (Hull No. 33) under the first four contracts was launched in January 1939, and completed and delivered to defendant July 30, 1940. The company sustained a loss of $321,671 on this vessel, the adjusted contract price therefor being $1,840,663 and the actual cost thereof to the Company being $2,162,334. Hull No. 34 was completed November 14, 1940, about the time the company defaulted on its contracts and sold its assets and business to the Tampa Shipbuilding Company, Inc., as hereinafter stated in more detail, in consideration of the assumption by the new company of all the liabilites of the old company.

It seems obvious from what has been said that the old company was not in such financial condition, when the first ship was completed and delivered, as would enable it to complete the remaining seven ships without additional financing or loans. And it is equally obvious, we think, that the company was in no position to obtain additional loans from the Reconstruction Finance Corporation, or elsewhere.

By September 30, 1940, the company's assets, as shown on its books (exclusive of any equity which it may have had in the ships then under construction), which consisted principally of "plant and equipment," were $2,977,340.12, and on the same date its liabilities amounted to $3,716,432.28, exclusive of advances totaling $6,548,396.57 theretofore made by the Maritime Commission on account of the ships (Hulls 33, 34, 35, and 36). See Finding 23. Many creditors were pressing the company to pay them amounts due, and some were threatening to bring suits. By giving the company credit for the greatest possible equity, on the basis of the record, of $345,000, by reason of its interest in the vessels under construction, its liabilities still exceeded its assets by almost $400,000.

In the fall of 1940, the old company was unable to meet the payment due in that year on the principal and the interest on its R. F. C. loan, and officials of the R. F. C. had indicated to the old company that they would be compelled to foreclose on the company's outstanding loans. The company had very little free cash on and after September 30, 1940, and there was then little, if any, hope that it could remedy its insolvent condition.

During the summer and fall of 1940 the Maritime Commission was much concerned about the ability of the company to complete the first four ships and to pay its outstanding obligations incurred in connection therewith, and, also, about the problem of the security for the large progress payments that had been made. The R. F. C. was concerned about the ability of the company to make the agreed payments of principal and interest on the loans. It was also concerned, and rightly so, about the adequacy of the existing security for the loans. At this point, Mr. George B. Howell, vice president and trust officer of The Exchange National Bank, again entered into discussions concerning the company's financial condition and the condition of its work un-

der the contracts, with officials of the Maritime Commission and the Reconstruction Finance Corporation. Many discussions were also had by these officials with Mr. Ernest Krcher about these matters. The pertinent facts relative to these discussions and the formation of a new company by Howell, as a result thereof, to take over the contracts, business, and assets of the old company, are set forth in detail in findings 25 to 37, inclusive. Howell's letter of October 29, 1940, to the Commission and the R. F. C., setting forth the terms and conditions under which a new company would purchase the assets of the old company and assume its liabilities, is set forth in finding 27. The plan proposed by Howell, with which the old company and Kreher were familiar, was approved by the Commission, the R. F. C., and the stockholders of the old company, and it was in all respects legally carried out and finally consummated November 14, 1940. As shown in findings 31 and 32, the old company executed a bill of sale and a warranty deed, selling and conveying to the Tampa Shipbuilding Company, Inc., its entire properties of every description, except the right to use its corporate name.

Defendant says first, that the petition should be dismissed because only three of the six director-trustees have joined in the institution and prosecution of the suit. Counsel for plaintiffs admits that no action was taken whereby a majority of the trustees of the dissolved corporation authorized the institution of this suit, but says that H. S. Phillips was disqualified as a trustee because of his appointment, prior to the filing of the petition, as U. S. District Attorney at Tampa, and that the three plaintiffs, therefore, constitute a majority of the qualified trustees. There is no showing that Phillips was disqualified from voting as a trustee and we see no reason why his position should prevent him from doing so. Counsel further says that, if the court deems such action necessary, he can add E. K. Standfuss as a party plaintiff. That is not a matter upon which the court can give advice. Standfuss has never indicated his approval as a trustee of the institution and prosecution of the suit nor has he indicated

in writing, since the petition was filed, his desire to be made a party. As the record stands, the case should be dismissed for lack of authority in three of the six trustees to prosecute it under the Florida statutes, as we interpret them. Bagnell v. Ives, C.C., 184 F. 466; Irwin v. Larson, 5 Cir., 94 F.2d 187, 115 A.L.R. 386; Dingman v. Boyle, 285 Ill. 144, 120 N.E. 487. However, it is not necessary that we base our decision on this ground since we are of opinion, on the entire record, that no recovery can be had on the merits.

The claim of plaintiffs is, in substance, that the defendant's preparation of the organization chart and its suggestions, as shown in the findings, of the men who should be appointed to the positions shown thereon, amounted to the taking over by defendant of complete control of the business of the corporation; and that the action of the officials of the Maritime Commission and the Reconstruction Finance Corporation, in prevailing upon George B. Howell to form a new corporation to take over the properties of the old company and forcing the officers and stockholders of the old company to agree to such plan, constituted a taking by the Government under the Fifth Amendment, of the entire properties of the Tampa Shipbuilding & Engineering Company.

We can find no merit in any of these contentions. The record shows throughout that the basic reason for the inability of the old company to complete its contracts was due to its lack of sufficient capital to carry on its shipbuilding operations necessary to the performance of its contracts. The record indicates that the company may have underestimated the cost of the ships. The reorganization of the supervisory staff, after a thorough investigation of the company's operations, was agreed to by the company and was obviously put into effect solely for the purpose of saving expense and expediting the work. The record does not establish that any action of the Maritime Commission, in connection with this reorganization, amounted to a breach of the contracts. The names of the men subsequently appointed to the various positions were shown on the organization chart

agreed to by the company. The Maritime Commission only recommended. The company made the appointments. Certainly the agreement by both parties to the plan for reorganizing the company's supervisory personnel, cannot be construed as a taking by defendant of any property of the company or as a step in an ultimate taking.

As hereinabove shown, the old company found itself in a position, in the fall of 1940, where it could not carry on its operations under the contracts without substantial additional capital, which it could not obtain. In the circumstances we think the stockholders of the old company were fortunate in having the new corporation take over the assets of the old company in consideration of the assumption of its obligations and liabilities. The stockholders of the old company ultimately received 3,600 shares of the stock of the new corporation which they sold, in 1945, for $360,000 in cash. In addition, Ernest Kreher was relieved of personal liability on the performance bonds and on the RFC loans. At the time of the reorganization in November 1940, the stock of the old company was without value.

We think it is clear from the facts established by the record that there was no taking by the defendant. No right, title, or interest in any property of the old company ever vested in the United States. Nothing which the officials of the Maritime Commission or the Reconstruction Finance Corporation did in connection with the formation of the new company and the purchase by it of the assets of the old company, can be construed as a taking of the old company's property by the Government. The defendant acquired no benefit from the sale to the new company except the indirect benefit of having the ships completed free of claims, at about the time the old company had originally agreed to deliver them, without the expense and delay incident to bankruptcy, receivership, or foreclosure proceedings. Nothing was taken within the meaning of the Fifth Amendment from the old company. The stockholders of the old company, with full knowledge of the facts, unanimously approved the plan of reorganization proposed by George B. Howell, and agreed to by the Maritime Commission and the Reconstruction Finance Corporation. In his testimony in this case Mr. Howell correctly summarized the situation of the stockholders of the old company, in 1940, and the benefits which inured to them and the creditors of the old company, under the plan of reorganization and sale, as follows:

"Q. Now, when the reorganization took place, and the contracts were complied with by the new corporation, as has been testified in this case, in your opinion did the stockholders of the old company fare better or worse, by reason of the reorganization than if there had not been a reorganization?

\*   \*   \*   \*   \*   \*

"The Witness: The stockholders were very much better off. At the time of reorganization, the mortgage on the plant was in default, which, if it had been foreclosed, would have wiped out the stockholders, and Mr. Kreher had pledged all of his stock as surety, as guarantor on the contract, and, in addition to that, Mr. Kreher had personally endorsed and guaranteed that mortgage to the RFC. In fact, they had gone so far as to send an attorney here to see if his home was in his name, and what he owned outside of the stock of the company, because they were getting ready to take judgment against him on his guaranty of that mortgage, and that was one of the factors that I mentioned which got me interested in trying to do something in regard to this reorganization, because Mr. Kreher and his family, who owned about sixty-five percent of the company, would have been completely wiped out, and it would have meant the closing down of an industry in Tampa which we all had worked for years to get started, first beginning the drydock in 1934 or 1935, and then the shipyard.

"Q. How about the creditors of the company? Did they fare better or worse?

"A. The creditors were ultimately paid out one hundred cents on the dollar."

The plaintiffs are not entitled to recover and their petition is dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.