In re GOVERNMENT OF NORWAY and
Government of the United States of
America.

No. Cong. 6-57.

United States Court of Claims.
April 8, 1959.

C. A. Torstensen, James J. Lenihan, Washington, D. C., and Jens Evensen, for the Government of Norway.

J. Lee Rankin, Sol. Gen., Washington, D. C., and Melford O. Cleveland, Wilton, Ala., for the Government of the United States.

JONES, Chief Judge.

This matter comes before the court pursuant to the Convention of March 28, 1940 (62 Stat. 1798), concluded between the Governments of Norway and the United States.[1] In general, it provides for the disposition of claims of Norway on account of damages alleged to have been sustained during and immediately after World War I by the late Christoffer Hannevig with respect to certain of his properties and interests.

The Convention provides for the exchange of pleadings and supporting evidence by the two Governments. Within the agreement is the further declaration that evidence not submitted pursuant to its terms shall be inadmissible. After permitting an exchange of briefs by the two countries, the Convention additionally provides that, should the Governments within a stated time be unable to reach an agreement as to the disposition of the claims, the entire record, subject to congressional approval, is to be referred to this court for decision on the issues presented.

The two Governments have long since complied with those articles of the Convention relating to the documentation of their respective cases. But attempts to bring about a settlement of the various claims of Norway have proved unsuccessful. As directed by the Convention, the dispute was then presented to Congress to obtain authorization for its referral to the United States Court of Claims. That request was granted[2] and on December 12, 1957, the numerous documents, pleadings and evidence required under the Convention were filed by the parties with this court. The matter was presented to the court by oral

1. The Convention was signed by the Minister of Norway to the United States and the United States Secretary of State on March 28, 1940. Because of the German invasion of Norway in April 1940, and later American involvement in World War II, it was not until June 29, 1948, that the Convention was ratified by the President of the United States, advice and consent of the Senate of the United

States being given on April 30, 1948. Ratification by His Majesty the King of Norway followed on October 1, 1948. Exchange of the instruments of ratification occurred on November 9, 1948, and the Convention was proclaimed by the President of the United States on November 22, 1948.

2. The Joint Congressional Resolution of June 27, 1957 (71 Stat. 191).

argument on October 2, 1958. It is before us for decision in conformity with applicable law, including international law.[3]

The relief sought by Norway consists of just compensation for the requisition by the United States Shipping Board Emergency Fleet Corporation (the Fleet Corporation) on August 3, 1917, of 18 contracts for ship construction allegedly existing between Hannevig or Hannevig interests and shipbuilders in this country, and for the alleged requisition and use, during the period August 3, 1917 to September 29, 1920, of shipyards supposedly owned by Hannevig.

The sum of $16,255,250 is claimed for the contracts and $8,973,198.47 for the use of the shipyards, together with interest.

Christoffer Hannevig, on whose behalf the Government of Norway is suing, had prior to 1916 established himself as a dealer in ships and ship construction contracts in Norway. In 1915 he visited the United States and was immediately impressed by the potential which existed here in the shipbuilding industry. He saw that needed replacements in the Norwegian shipping fleet could be obtained through the use of shipyard facilities in this country. With this purpose in mind he returned to the United States in 1916. His first acquisition was the Pusey & Jones Company. This company, located at Wilmington, Delaware, had for a number of years been engaged primarily in the production of paper manufacturing machinery. What was important to Hannevig, however, was the company's existing facilities for the construction of small vessels. After securing a controlling interest in Pusey & Jones,[4] Hannevig began to enlarge the shipbuilding capacity of that company.[5]

Christoffer Hannevig also caused to be created two shipbuilding companies, with sites for their proposed yards located across the Delaware River from the Wilmington yards of Pusey & Jones. Those companies were the Pennsylvania Shipbuilding Company, situated at Gloucester, New Jersey, and the New Jersey Shipbuilding Company whose yards were adjacent to those of the Pennsylvania company. The purpose in establishing these new companies, and in undertaking the construction of their shipbuilding plants, was to make possible the building of standard-type vessels which had larger capacities than those planned for construction at the enlarged Pusey & Jones facilities.[6] Almost im-

3. The Convention under which this dispute is referred requires that the pleadings presented by the two governments be accompanied by all the evidence upon which they rely in support of their claims and defenses. Submitted in this manner, with several thousand printed pages of documentary evidence, we find no need to follow our customary procedure by referring the dispute to a trial commissioner. In this situation, rather than prepare exhaustive findings of fact on the many facets of this case, we have incorporated in our opinion, as supplemented by footnote material, only those facts which we feel provide a proper disposition of the Norwegian claims. This approach seems to be consistent with the terms of the Convention relating to the presentation and proof of the contentions of the two parties.

4. In March of 1916 Hannevig exercised an option for the purchase of the issued and outstanding stock of the Pusey & Jones Company, an option which he acquired during the previous year.

5. The alteration and expansion of the company's shipbuilding facilities were designed to accommodate the construction of large seagoing vessels, reaching a maximum of $4,500 deadweight tons. To accomplish this purpose, four shipways were remodeled and expanded. Also necessary was the installation and construction of cranes, plate shops, furnaces, mold loft, machine shop, iron foundry, fitting shops and the machinery and equipment required therefor.

6. The Pennsylvania company, incorporated under Delaware law on February 9, 1916, was planned to handle the construction of standard tankers of 7,000 deadweight tons and standard cargo ships of 12,500 deadweight tons.

For the construction of a standard 5,000-deadweight-ton cargo ship, designed by Hannevig and his associates, the New Jersey company was established under Delaware law on May 3, 1917.

mediately after the incorporation of the Pennsylvania and New Jersey companies the construction of their yards was begun.[7]

On January 22, 1918, the three shipbuilding companies described above were consolidated under Delaware law to form a single corporation, The Pusey & Jones Company.

While expansion and construction of the three shipyards were underway, and prior to August 1917, Hannevig was instrumental in placing shipbuilding contracts with them. They took the form of contracts entered into with Hannevig personally or with two marine shipping companies which Hannevig had incorporated under Delaware law: the Bulk Oil Transports, Inc., incorporated on June 6, 1916, and the Manss Steamship Corporation, organized on January 24, 1917.

The record indicates that by August 3, 1917, the date on which the Fleet Corporation issued requisition orders, arrangements for the construction of 45 ships had been made by the Pusey & Jones, Pennsylvania and New Jersey companies.[8] Of those vessels requisitioned, only 18 of them, discussed *infra*, provide subject matter for Norway's present claims.

It is the contention of Norway that Hannevig was the sole beneficial owner [9] of the three shipbuilding companies, both before and after their consolidation, and also the Bulk Oil and Manss corporations. While the United States denies these assertions, and offers evidence in support of its position, we find it unnecessary to rule upon that question. Instead, we think that disposition of this matter can, and should, turn on issues more fundamental to the basic Norwegian claims.

■■ As to the claim concerning the 18 alleged ship contracts, we are of the opinion that nine of those contracts did not exist on August 3, 1917. Norway's claim for the nine contracts actually existing on that date is also without merit. Following their requisition, the United States paid the former contract owners compensation under circumstances which make it improper for Norway to receive additional sums in the way of just compensation. Our reasons follow.

To overcome the existing shortage in United States shipping tonnage, a shortage made critical by our entry into the war on April 6, 1917, and to insure an adequate postwar merchant marine fleet, the United States Shipping Board Emergency Fleet Corporation on August 3, 1917, issued orders requisitioning all ships in excess of 2,500 deadweight tons under construction in yards, certain ship materials and commitments for materials necessary for completion of the vessels.[10]

---

7. Plans for the building of the Pennsylvania yards called for the construction of six shipways, two of the shipways to be used in the construction of vessels up to 7,000 d.w.t., and the remaining four to handle vessels up to 12,500 d.w.t.

The construction program for the New Jersey company provided for seven shipways for the contruction of vessels in the 5,000 d.w.t. class.

8. On that date the Pusey & Jones Company had contracted for the construction of 14 vessels, designated as Hulls 1001 through 1014. The Pennsylvania company had arrangements for the construction of 19 vessels, designated as Hulls C-1 through C-19. Hulls C-15 to C-19, inclusive, were to be built for the company's own account. The New Jersey company had arranged for the construction of 12 vessels, Hulls H-201 through

H-212. Hulls H-209 to H-212, inclusive, were to be constructed for the New Jersey company's own account.

9. Norway takes the position that though the stock of the various companies was issued in the names of persons other than Christoffer Hannevig those shares had been indorsed in blank and delivered to Hannevig or his personal representative.

10. Identical requisition orders were sent to all United States shipyards by the Fleet Corporation. They stated:

"By virtue of an act of Congress, approved June 15, 1917, entitled 'An act making appropriations for the Military and Naval Establishments on account of war expenses for the fiscal year ending June thirtieth, nineteen hundred and seventeen, and for other purposes,' and by authority delegated to the United States

While it was the position of the Fleet Corporation that the requisition orders were intended to cover only the ship hulls and the materials necessary to complete them,[11] the Supreme Court in Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934 (1924), ruled that they also constituted a requisition of the owner's interest in the contracts themselves—for which just compensation must be paid.

These requisition orders were served on the Pusey & Jones, the Pennsylvania and the New Jersey shipbuilding companies.

It is for Christoffer Hannevig's interest in 18 ship construction "contracts" which had been placed with the three shipbuilding companies prior to August 3, 1917, that Norway now seeks just compensation.[12] They are briefly identified as follows:

| Number of Ships | Hulls | Contract Owner | Shipbuilder |
|---|---|---|---|
| 5 | C–15–19 | Hannevig | Pennsylvania |
| 4 | H–209–212 | Hannevig | New Jersey |
| 1 | H–1009 | Bulk Oil | Pusey & Jones |
| 4 | C–11–14 | Bulk Oil | Pennsylvania |
| 4 | H–201, 202, 207, 208 | Manss Corporation | New Jersey |

Shipping Board Emergency Fleet Corporation under Executive order of the President, dated July 11, 1917, all power-driven cargo-carrying and passenger ships, above 2,500 tons d.w. capacity, under construction in your yard and certain materials, machinery, equipment, outfit, and commitments for materials, machinery, equipment, and outfit necessary for their completion are hereby requisitioned by the United States.

"On behalf of the United States, by virtue of said act and said order, you are hereby required to complete the construction of said requisitioned ships under construction and will prosecute such work with all practicable dispatch.

"The compensation to be paid will be determined hereafter and will include ships, material, and contracts requisitioned.

"You will furnish immediately general plans and detail specifications of the ships requisitioned, and copies of contracts and all supplemental agreements in relation thereto, and full particulars as to owner, date of completion, payments made to date, amounts still due, and any other information necessary to a fair and just determination of the obligations of the Emergency Fleet Corporation in taking over these ships and contracts.

"You will report immediately, whether any additional contracts are under consideration and their character and extent, and will not enter into any additional contracts or commitments with respect to merchant tonnage without express authority from this Corporation."

11. Under its interpretation of the effect of the requisition orders, the Fleet Corporation had, prior to the decision in Brooks-Scanlon Corp. v. United States, 1924, 265 U.S. 106, 44 S.Ct. 471, 68 L. Ed. 934, reimbursed the former contract owners the construction progress payments they had made to shipbuilders and all out-of-pocket expenditures for materials, supplies, blueprints, etc. By so doing, the Fleet Corporation considered its obligation to the former contract owners discharged.

12. The test to be used in determining just compensation for ship contracts requisitioned by the Fleet Corporation's orders of August 3, 1917, was outlined by the Supreme Court in the Brooks-Scanlon decision. In the Court's language (265 U.S. 106, 123–126, 44 S.Ct. at page 475).

"It is the sum which, considering all the circumstances—uncertainties of the war and the rest—probably could have been obtained for an assignment of the contract and claimant's rights thereunder; that is, the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy.

\* \* \* \* \*

" \* \* \* [V]alue so far as material, rather than replacement cost, should be taken into account \* \* \*. The value of such ships at the time of requisition, and the then probable value at the time fixed for delivery, the contract price, the payments made and to be made, the time of elapse before completion and delivery,

It is the nine contracts listed as being owned by Hannevig personally which we find not to have existed on the date of requisition.[13]

Looking to the record, it establishes that the shipbuilders supposedly committed under these contracts, i. e., the Pennsylvania and the New Jersey companies, *did not* initially consider themselves under contract with Hannevig for the construction of these ships. Thus, in response to a request by the Fleet Corporation for information relative to ship construction contracts placed with the Pennsylvania company at the time of requisition, the latter replied on October 2, 1917, adding the following significant language:

> " * * * For the information requested under the fifth paragraph of the letter regarding the actual stage of construction, we beg to refer to information handed to Mr. McDermott in person and by letter under date of August 13, 1917, and in conformity with which we claim that eighteen ships are actually under construction, *fourteen of which are under contract and the last four of which were being constructed for our own account.*" [Emphasis supplied.]

These "last four" ships and another hull later added to the group comprise hulls C–15 through C–19.

This same matter was later mentioned indirectly in a letter written by the Fleet Corporation on October 27, 1917, to the Pennsylvania company to provide for its temporary financing. In that letter it was stated:

> " * * * You were constructing on August 3d, 1917, eighteen ships at your yard, of which Nos. 1 to 14, both inclusive, were being constructed under contracts with other parties. Nos. 15 to 18, inclusive, are being constructed for the account of your company itself. * * *" [As mentioned above, hull number 19 was later added to this latter group.]

Based as it was on information supplied the Fleet Corporation by itself, this assertion was not questioned or denied by the Pennsylvania company. And presumably the letter was brought to the attention of a responsible corporate official—it is indorsed "Accepted for the Pennsylvania Shipbuilding Company. By H. E. Norbom, *President.*"

It was not until early 1918, following consolidation of the three shipbuilding companies, that we find a shift in this position. The claim was then made that hulls C–15 through C–19 had been committed upon verbal order from Christoffer Hannevig, and at a time before the requisition orders were issued. The record offers little support, however, for the view that binding and enforceable con-

---

the possibility that by reason of the government's action in control of materials, etc., the contractor might not be able to complete the ship at the date fixed for performance, the loss of use of money to be sustained, the amount of other expenditures to be made between the time of requisition and delivery, together with other pertinent facts, are to be taken into account and given proper weight to determine the amount claimant lost by the taking * * *."

13. Pennsylvania hulls C–15 through C–19, determined by the Fleet Corporation to be under construction on August 3, 1917 and therefore within the requisition orders, were later completed for the United States at cost, plus a profit of $204,000 per ship, plus one-half of the savings where the cost of a vessel was less than $2,040,000.

Hulls H–209 through H–212, to be built at the New Jersey yards and determined by the Fleet Corporation to be under construction on August 3, 1917, were contracted for by the Fleet Corporation at cost, plus a profit of $17.50 per deadweight ton. It was further agreed that in the event the cost of the vessels, including the above profit, amounted to less than $175 per deadweight ton, then the New Jersey company was to share in one-half of the savings. Work on these hulls was cancelled by order of the Fleet Corporation on September 8, 1919, and cancellation fees, computed on the cost of the work performed, plus a profit based on profits earned on three similar vessels actually completed for the Fleet Corporation, were credited to the consolidated Pusey & Jones Company.

tracts resulted from these oral understandings. Not only does such a position conflict with the Pennsylvania company's previous estimate of its building commitments, but it is also contrary to certain basic rules of contract law.

Inasmuch as the contracts would have been between Hannevig and himself—the Pennsylvania company—they are to be subjected to rigorous scrutiny. Pepper v. Litton, 1939, 308 U.S. 295, 306, 60 S. Ct. 238, 84 L.Ed. 281. Here the only evidence tending to bear out the assertion that oral contracts existed for hulls C–15 through C–19 consists of statements to that effect made by the Pennsylvania company to the Fleet Corporation. That the Fleet Corporation thereafter relied on these statements when it referred, in several instances, to the hulls as being committed under verbal order of Christoffer Hannevig does not, however, necessarily elevate informal understandings to the level of binding contracts.[14]

At best, it could only be said that Hannevig placed verbal orders with the Pennsylvania company for the construction of standard type cargo vessels of 12,500 deadweight tons.[15] Elaborate plans and specifications for vessels of that type existed. However, the understanding between Hannevig and the Pennsylvania company did not go so far as to settle upon a contract price for the vessels or the dates upon which they would be completed and delivered. Because of this lack of certainty and definiteness we are of the opinion that the oral agreements were unenforceable as contracts. Willard Sutherland & Co. v. United States, 1923, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086; Weston Paper

Mfg. Co. v. Downing Box Co., 8 Cir., 1923, 293 F. 725; Lipman v. Arlington Sealing Co., 7 Cir., 1951, 192 F.2d 93. Had there been performance under the so-called contracts, to that extent they might have become valid and binding. Willard Co. v. United States, supra. But construction of the vessels had not begun prior to August 3, 1917, and Hannevig never made payments under his verbal understandings with the Pennsylvania company.

Norway must face the same problem in attempting to satisfy us that oral contracts for hulls 209 through 212 had been entered into between Hannevig and the New Jersey Shipbuilding Company. Thus, with respect to those "contracts" the New Jersey company on October 19, 1917, wrote the Fleet Corporation in part as follows:

"* * * We further beg to state that commitments have been made to a certain extent of four additional ships of the same design and capacity, and that *these four additional ships were intended to be built for our own account until they could be sold.*" [Emphasis supplied.]

It was at a later date, November 19, 1917, that the New Jersey company stated that hulls 209 through 212 were being built on the order of Christoffer Hannevig. The absence of written contracts was explained as being due to an inability to determine costs of the vessels. The New Jersey company promised, however, to submit its price to the Fleet Corporation as soon as the company estimates were completed.[16]

14. The record of this case indicates that when hulls C–15 through C–19 were constructed and delivered to the Fleet Corporation its rights and obligations concerning the vessels did not result from its position as assignee of contracts existing with the Pennsylvania company on August 3, 1917. Instead, the Fleet Corporation obtained the vessels pursuant to cost-plus arrangements negotiated with the company shortly after the requisitioning. See footnote 13, supra.

15. Norway asserts that the standard 12,500-deadweight-ton cargo ships which the Pennsylvania yards were equipped to build, and were building for other ship contract owners, were the vessels committed under Hannevig's verbal order.

16. In pertinent part, the New Jersey company's letter stated:
"* * * Replying to your letter of November 14th regarding contracts for Requisitioned Hulls, please be advised

But, again, to accept Norway's contention that oral contracts existed under these circumstances we must do so even though a price for the vessels had not been settled, and the delivery dates of the vessels were unspecified. We must further say that these oral understandings represented legal commitments by a shipbuilding company which, like the Pennsylvania company, customarily obligated itself to others in a definite, business-like fashion.[17] No doubt we could find some merit in the Norwegian argument had there been performance under the oral agreements. But, as in the previous situation, construction of hulls 209 through 212 had not begun by August 3, 1917, and Hannevig made no payments to the New Jersey company under the "terms" of their informal understandings. To say that binding and enforceable contracts existed under these circumstances has no persuasive effect.

It is for the above reasons that we are convinced that the nine oral contracts allegedly concluded between Hannevig and the Pennsylvania and New Jersey shipbuilding companies never had any existence in fact. That being the case, Norway is left without a claim as to that issue.

It is also our conclusion that no amounts are due for the remaining nine contracts involved in this proceeding. On August 3, 1917, those contracts had been placed with the three shipyards by the Bulk Oil Transports, Inc., and the Manss Steamship Corporation. Norway alleges that Christoffer Hannevig was the sole beneficial owner of those two companies.[18] But as we have previously indicated, we find it unnecessary to rule upon that issue. Instead, we hold that to the extent that the Bulk Oil and Manss companies made payment on account of their contracts, they have been reimbursed by the United States, and have executed releases for any other amounts that might have been due as a result of the requisitioning.

Prior to August 3, 1917, an installment in the amount of $41,325 had been paid by Bulk Oil to Pusey & Jones on the contract for the ship listed above as hull 1009.[19] Also before that date, Bulk Oil had paid to the Pennsylvania company the following amounts on the contract price of the hulls listed as C–11 through C–14: $5,000 in cash plus notes totaling $225,000. These notes were paid by Bulk Oil after August 3, 1917. In addition, Bulk Oil gave as progress payments other notes amounting to $247,500 which were later discounted by the consolidated Pusey & Jones Company—successor to

that no contracts have yet been written up or signed covering Nos. 9 to 12, inclusive.

"These Hulls are being built for account of Mr. Christoffer Hannevig and will be 5,000 ton cargo steamers similar in all respects to Nos. 1 to 8. No written contracts for these have been made out because so far we have not been able to determine the cost. We are working on this, however, and we will submit our price to you as soon as our estimates are completed."

17. Hulls C–1 through C–14, the remaining vessels under construction at the Pennsylvania yards on August 3, 1917, were committed under written contracts. Delivery date of the vessel, as well as contract price, was specified in each of those written agreements.

The only vessels other than hulls 209 through 212 under construction at the New Jersey shipbuilding company on August 3, 1917, were designated as hulls H–201 through H–208. Those hulls were under written contract with the Manss Steamship Corporation. Included within those written agreements were contract prices for the vessels and their dates of delivery.

18. See footnote 9, supra.

19. The contract for hull 1009 was entered into on June 12, 1917. It provided for the contruction of a standard cargo ship of 4,350 tons deadweight capacity. The purchase price of $826,500 was payable in 11 installments. Upon the execution of the contract, and prior to August 3, 1917, Bulk Oil Transports, Inc., paid to Pusey & Jones the first installment, amounting to $41,325.

the Pennsylvania company. On March 8, 1920, these notes were being held by the Empire Trust Company of New York.[20]

Thus the total amount actually paid by Bulk Oil for the five hulls was $271,325. The Fleet Corporation on December 26, 1917, paid to Bulk Oil the sum of $250,000 in reimbursement of its advance payments, leaving a balance due of $21,325. This latter amount was paid by the United States on or about March 12, 1920.

On August 27, 1919, Hannevig wrote to the Fleet Corporation and, after reciting the above facts about the payments, stated that if a just compensation proposal then under discussion could be speedily consummated, Bulk Oil, as owner of the five ships requisitioned, would accept as just compensation for its property taken the amount of its expenditures for the ships.[21]

Though the proposed settlement referred to in Hannevig's letter of August 27, had by that time been withdrawn by the Fleet Corporation from further consideration, a release was signed on March 8, 1920, by Ralph Bullowa as president and secretary of Bulk Oil Transports, Inc., releasing the Fleet Corporation from:

" * * * all claims and demands of whatsoever character growing out of, connected with or arising in consequence of the requisition orders issued by the Fleet Corporation with respect to the vessels, and the materials and commitments therefor, formerly under contract between Bulk Oil Transports, Inc., and Pennsylvania Shipbuilding Company or Pusey & Jones Company, *and from all claims or demands whatsoever on account of any acts in connection with or pursuant to said requisition orders or the subsequent construction of said vessels for account of the United States Shipping Board Emergency Fleet Corporation.*" [Emphasis supplied.]

The signature of Bullowa was attested by Hannevig and the release was also signed by him as president of Pusey & Jones Company.

The consideration recited in the release was an advance by the Fleet Corporation

---

20. The contracts for hulls C–11 and C–12 were entered into on August 1, 1916, and provided for the construction of standard cargo ships of 12,500 tons deadweight capacity. The contract price for each vessel was $1,562,500, payable in 10 installments of $156,250 each.

By August 3, 1917, Bulk Oil had paid the Pennsylvania Shipbuilding Company $1,562.50 in cash and $154,687.50 in notes as the first installment on hull C–11. The notes were paid by Bulk Oil after August 3, 1917, and later in the year.

As the first installment on hull C–12, Bulk Oil paid the Pennsylvania company $1,562.50 in cash and $154,687.50 in notes prior to August 3, 1917. The notes in the amount of $154,687.50 were discounted and later paid by the Fleet Corporation.

The contracts for hulls C–13 and C–14 were entered into on August 1, 1916, and provided for the construction of standard cargo ships of 7,500 tons deadweight capacity. The contract price for each vessel was $937,500, payable in 10 installments of $93,750 each.

By August 3, 1917, Bulk Oil had paid the Pennsylvania company as a progress payment toward hull C–13 $937.50 in cash and $92,812.50 in notes. The sum of $70,312.50 was paid on the notes later in 1917.

By August 3, 1917, Bulk Oil had paid as progress payment on hull C–14 $937.50 in cash and $92,812.50 in notes. The notes were discounted and later paid by the Fleet Corporation.

It was the notes, or renewals thereof, given as payments toward hulls C–12 and C–14 which were discounted by the consolidated Pusey & Jones Company and were being held by the Empire Trust Company on March 8, 1920.

21. The Hannevig letter reads in part as follows:

"The Bulk Oil Company was thus the owner of five ships under construction which were requisitioned by the Emergency Fleet Corporation and under the Act of Congress is entitled to just compensation for its property taken. However, if the settlement agreed upon with Mr. Ackerson on August 25, 1919 * * is promptly consummated, the Bulk Oil Transports, Inc., will accept in satisfaction of its claim the amount of its expenditures as above stated (less refund by Emergency Fleet Corporation) with interest."

to Pusey & Jones of an amount necessary to cover the Bulk Oil notes of $247,500 and interest, such notes being held by the Empire Trust Company, and the previous reimbursement of $250,000 made by the Fleet Corporation to Bulk Oil. Under the release, Pusey & Jones agreed to credit the Fleet Corporation with the advance as part payment of the cost of constructing vessels for its account and to take up and cancel the notes.

■ We are of the opinion that the language of the agreement of March 8, 1920, specifically that part which we have italicized, released all additional claims— including that for the value of the contracts requisitioned—which Bulk Oil or its alleged owner, Christoffer Hannevig, had against the Fleet Corporation.[22]

The Manss Steamship Company, prior to August 3, 1917, had made payments to the New Jersey Shipbuilding Company on the four contracts covering hulls H–201, 202, 207 and 208 in the amount of $218,750.[23] By August 1919, the Fleet Corporation had reimbursed $175,000 to Manss. This left a balance due of $43,750.

The Manss company became inoperative in March of 1923 for failure to pay Delaware franchise taxes. In 1927, upon the representation of creditors of the former corporation that a claim of the Manss company was payable by the United States Shipping Board, the Chancery Court of Delaware appointed a receiver for the purpose of collecting the claim and paying its proceeds to creditors.[24]

22. Despite the all-inclusive language used, Norway urges the inapplicability of this release to any claim for compensation for the requisitioning of the contracts. It does so on the ground that at that time, March 8, 1920, the Fleet Corporation was taking the position that no compensation was allowable for the contracts. While this was true, the fact is that the claims later upheld in Brooks-Scanlon Corp. v. United States, supra—that the contracts themselves had been taken under the requisition orders—were presented to the Fleet Corporation before the date of the release. Thus in the Brooks-Scanlon case the claim for the value of the contracts was filed with the Fleet Corporation on October 20, 1919, the award was made by the Fleet Corporation on January 23, 1920, and it was rejected by the claimant on February 24, 1920, because of the Fleet Corporation's failure to include compensation for the contracts. After accepting 75 percent of the award, Brooks-Scanlon instituted suit in this court on March 13, 1920, to recover such compensation. Suits involving similar claims by former contract owners were also filed in this court during that period. See the cases reported at 64 Ct.Cl. 1, 11, 38, 59, 80, 98, 119.

In view of the above it is difficult to follow the Nowegian argument. For at the time the Bulk Oil release was executed the Fleet Corporation was beset with claims by others for contract values allegedly taken under the requisition program. Since the Fleet Corporation then firmly opposed the idea that the requisition orders caused a 'taking" of the

ship contracts, we would hardly expect to find in the Bulk Oil release of March 8, 1920, language expressly releasing claims "with respect to the contracts for the vessels" or similar language to that effect. We are rather of the opinion that the broad language releasing the Fleet Corporation from " * * * all claims or demands whatsoever on account of any acts in connection with or pursuant to said requisition orders * * " was designed to cover claims of that sort. Cf. De Luca v. United States, 1930, 69 Ct.Cl. 262, 267.

23. Contracts for these four vessels were entered into on June 1, 1917. In each case they provided for the construction of a standard cargo ship of 5,000 tons deadweight capacity. The contract price of each vessel was $875,000, payable in 10 installments of $87,500 each.

On the contracts covering hulls H–201 and H–202 the Manss company paid $87,500 each—a total of $175,000. On hull H–207, $87,500 was paid, consisting of $43,750 in cash and $43,750 in notes. On hull H–208, $87,500 was paid entirely in notes. The notes on these two vessels were never discounted and they continued to be held by the New Jersey Shipbuilding Company.

24. Under Delaware law a corporation whose charter has expired is given three years in which to wind up its affairs. Chapter 65, § 1954 Del.Code, 1915. (Chapter 65, § 2074 Del.Code, 1935.) Now 8 Del.C. § 278. It has been held that the Delaware chancellor may appoint

On February 21, 1927, the receiver wrote to the Shipping Board and offered to accept $43,750 with interest in full settlement of all claims of the Manss company against the United States. During the following month, the receiver filed a report with the Delaware Chancery Court listing the claim against the Shipping Board as the only asset of the Manss company. On March 21, 1927, the receiver petitioned the Delaware court for permission to settle this claim. In the petition it was stated that the Manss company had been unable to convince the Shipping Board of the probable market value of its requisitioned contracts. Largely for that reason, it was stated, the claim had been confined to the unreimbursed balance of $43,750 plus interest.[25] On the same day the court authorized the receiver to settle for that amount, with interest computed from August 3, 1917.

On March 30, 1927, the Manss company and its receiver executed a release of the above claim. The release, after reciting the consideration, reads as follows:

"[The Manss Steamship Corporation and its receiver] * * * by these presents do for themselves and their successors and assigns severally remise, release and forever discharge the United States Shipping Board, the United States Shipping Board Merchant Fleet Corporation, and the United States of America, and each of them and the successors and assigns of any thereof, of and from all manner of controversies, claims, acts, actions, demands, suits, damages, judgments, executions, recoveries, costs and expenses, whatsoever, in law, equity and/or admiralty, which against the said United States of America, the United States Shipping Board and the United States Shipping Board Merchant Fleet Corporation, and the successors and assigns of any thereof, jointly and severally, they, the said Manss Steamship Corporation, and Harry V. Lyons, Receiver of Manss Steamship Corporation, ever had, now have or which they or their successors and assigns hereafter can, shall or may have, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents."

On November 29, 1927, the receiver's final account was filed with the Delaware Chancery Court listing $64,947.77 as having been received from the Shipping Board. Disbursements to various creditors of the Manss company were indicated in the account. The Delaware court approved the account on December 1, 1927, and the receiver was discharged.

■ No attempt has been made to rescind either the Bulk Oil or the Manss company release and restore the United States to the position it was in when the release was executed. For that matter, the extensive record of this proceeding

---

a receiver at any time, even after the expiration of the three-year period, to wind up the affairs of a dissolved corporation. Harned v. Beacon Hill Real Estate Co., 1911, 9 Del.Ch. 232, 80 A. 805.

25. The petition stated in part:
"* * * prior to the appointment of your petitioner as Receiver, negotiations between the company's representatives and the Government with respect to said claim have been pending almost continuously during the past several years; your petitioner is informed that the company

has so far been unable to produce evidence satisfactory to the Shipping Board as to the probable market value of the contracts requisitioned, and has, therefore, largely confined its claim to the demand for the repayment of the said balance due of Forty-three Thousand, Seven Hundred and Fifty Dollars ($43,-750), together with interest at the rate of Five (5%) per centum, per annum from the third day of August, A.D. 1917 on account of said advances by the company to the New Jersey Ship Building Company, the benefit of which advances accrued to the Government: * * *".

reveals no basis for rescission of either of the two releases.

It is our opinion that the claim of Norway relating to the requisitioned ship contracts is without legal basis. The treatment of the contracts by the Fleet Corporation and the United States Shipping Board and the manner in which the contract claims were settled appear to be in accord with fair dealing.

Norway's additional claim rests upon the allegation that the United States requisitioned the use and total output of the yards of the Pusey & Jones, Pennsylvania and New Jersey shipbuilding companies. Just compensation for this claim is said to be $8,973,198.47.

█ While the Fleet Corporation was authorized by statute to requisition shipbuilding plants, [26] its requisition orders did not purport to do so.[27] The orders expressly stated that ships under construction and materials necessary for their completion were being requisitioned. The Supreme Court in Brooks-Scanlon Corp. v. United States, supra, held that the language employed in the requisition orders *necessarily* resulted in a "taking" of the ship contracts themselves.[28] A careful reading of the orders, however, does not convince us that they should now be extended, by implication, to include within the requisitioning the actual shipbuilding facilities.

We are further of the opinion that developments following the requisition of August 3, 1917, as they related to the shipyards before us, did not bring about a requisitioning of the yards. This is true even though the United States assumed a definite "interest" in their operation.

Under the orders of August 3, 1917, the Fleet Corporation had a right to insist upon the construction of the vessels it had requisitioned. In a sense, it put itself in the shoes of the contract owners. It acquired all the rights and advantages that assignees of the contracts would have had. Brooks-Scanlon Corp. v. United States, supra. The contract prices which the Fleet Corporation was obligated to pay to the shipbuilding companies were those existing under the requisitioned contracts.

The Fleet Corporation, however, obtained certain changes in the vessels it had requisitioned. Many of the changes, such as the installation of guns, searchlights, gun crew quarters, etc., were designed to equip the ships for wartime service. The shipyards were paid for those changes and extras as additional ship construction costs.

To protect its substantial interest in the vessels under construction, the Fleet Corporation had additional guards and fences placed around the shipyards. At its insistence, wage rates were increased. The expense of these requirements was likewise paid to the shipyards by the Fleet Corporation.

Altogether, the Fleet Corporation paid

---

26. The Act of June 15, 1917 (40 Stat. 182) authorized the President, acting through the Fleet Corporation:

"(d) To requisition and take over for use or operation by the United States any plant, or any part thereof without taking possession of the entire plant, whether the United States has or has not any contract or agreement with the owner or occupier of such plant."

27. See footnote 10, supra.

28. In Brooks-Scanlon Corp. v. United States, supra [265 U.S. 106, 44 S.Ct. 476] the Supreme Court was of the opinion that language in the orders directing the shipbuilders to complete the vessels in accordance with existing contracts, to supply the Fleet Corporation with plans and specifications of the requisitioned vessels, to submit statements of payments made and amounts still due, and to provide other information "necessary to a fair and just determination of the obligations of the Emergency Fleet Corporation in taking over these ships and contracts" necessarily caused a "taking" of the ship contracts.

the shipbuilding companies the net amount of $56,205,463.16.[29]

The supervision exercised by the Fleet Corporation over the construction of the vessels was no doubt rigorous. It had to be under the circumstances. But it is obvious that the substantial interest of the Fleet Corporation in the efficient operation of the shipyards, occasioned by its ownership of the vessels under construction, did not amount to a "taking" of the yards for which just compensation is allowable.

The Fleet Corporation also exercised certain controls over the companies' shipbuilding program in its capacity as creditor of those companies. But there too we feel that the Fleet Corporation's activities fell short of a requisitioning of the yards.

At the time the requisition orders were issued, August 3, 1917, construction of planned shipways was still underway, or had not yet begun, at the yards of the Pennsylvania and New Jersey shipbuilding companies.[30] To assist in the

---

29. The total amount *payable* by the Fleet Corporation to the consolidated Pusey & Jones Company under the ship construction contracts was $52,225,-734.56. This sum is computed in the following manner:

For 26 vessels completed on fixed price basis:
Cost .................................. $28,656,250.00
   For extras, changes and increased labor
   costs ............................. 6,222,658.48

                                  34,878,908.48     $34,878,908.48
For 5 vessels placed under contract for payment of cost plus $204,000 per ship, plus one-half of saving if cost should be less than $2,040,000 per ship:
Cost (including depreciation) ............ $8,930,116.25
Agreed profit ......................... 1,020,000.00
Profit on changes and extras ............ 76,298.43
Half savings .......................... 634,941.87

                                  10,661,356.55     10,661,356.55
For 3 vessels converted from fixed price basis to basis of cost plus profit of $17.50 per d.w.t.:
Cost (including depreciation) ............ $4,176,534.58
Profit at $17.50 per d.w.t. ................ 270,042.50
Profit on changes and extras ............. 4,201.20

                                  4,450,778.28     4,450,778.28
For 11 contracts cancelled prior to completion of the vessels. Cancellation fees based on cost plus profit:
Cost plus profit ........................ $2,234,691.25     2,234,691.25

     Total amount payable to Pusey & Jones ............ 52,225,734.56

As mentioned in the text of the opinion, the Fleet Corporation actually *paid* to the Pusey & Jones Company (or former contract owners who had made progress payments to Pusey & Jones) the sum of $56,205,463.16. The excess payment by the Fleet Corporation was largely in the form of advances for yard and ship construction. This excess was never repaid to the United States. At one point in the postwar litigation involving the interests of Christoffer Hannevig and the United States, the latter pressed a claim in excess of $14,000,000 against the Pusey & Jones Company. This claim was wiped out, however, in a settlement executed in 1926 between, among others, receivers of the Pusey & Jones Company and the United States.

---

30. By August of 1917, four ships were under construction at the Pennsylvania yards. However, the equipment for the recently constructed blacksmith and metal shops had not been completed. And it was not until late in the sum-

completion of the yards, the Fleet Corporation had, by late 1917, created a special account on which the companies could draw for shipyard construction.[31] Additional financial assistance by the Fleet Corporation was extended in the form of advance payments against the cost of the ships under construction. And by the end of January 1918, the Fleet Corporation had entered into arrangements with the then consolidated Pusey & Jones Company for the completion of 17 of the vessels on a cost-plus basis.[32]

But these measures were proving inadequate. More and more it became apparent that the consolidated Pusey & Jones Company lacked capital sufficient to complete its shipyard construction. As a result, a financing agreement was concluded in May 1918, between Pusey & Jones and the Fleet Corporation whereby $5,000,000 was to be advanced to Pusey & Jones for shipyard construction and working capital. Under the agreement Pusey & Jones gave the Fleet Corporation, as security for its advance, a mortgage on its real and personal properties, subject to certain prior liens. The agreement, several provisions of which were suggested by Pusey & Jones officials, permitted the Fleet Corporation to select one director and the treasurer of the Pusey & Jones Company. It further gave the Fleet Corporation rights, among others, to pass upon the plans and specifications of proposed shipyard construction, to inspect and approve the work done, and to examine and audit the accounts of the Pusey & Jones Company. The agreement also provided that no additional contract work was to be undertaken without the consent of the Fleet Corporation.

In our view the controls granted were clearly designed to safeguard the Fleet Corporation's intended financing of the Pusey & Jones shipyards. Similar protective measures were taken as to other shipyards financed by the Fleet Corporation. See Virginia Shipbuilding Corp. v. United States Shipping Board, D.C. 1923, 292 F. 440. Moreover, management controls such as exercised by the Fleet Corporation in this instance have been held not to constitute a "taking" of the debtor's property. Kreher v. United States, 1950, 87 F.Supp. 881, 115 Ct.Cl. 355, 393–395; Gorham v. United States, 1954, 119 F.Supp. 409, 127 Ct.Cl. 750.

It should also be noted that facts appearing in the record submitted by the two Governments are entirely inconsistent with the idea that the United States had requisitioned the Pusey & Jones shipyards. Pusey & Jones officials consistently treated the shipyards as belonging to the company.[33] Their negotiations

---

mer of 1918 that all the proposed cranes and slipways were ready for use.

On August 3, 1917, though considerable foundation work had been completed on a site which consisted of riverbed ground and lay partly under water, the actual construction work of the New Jersey company shipyards had not begun. The first keel was not laid until May 17, 1918.

31. Additional funds for the construction of the shipyards were obtained by the Fleet Corporation through its understanding with Christoffer Hannevig that amounts paid by the Fleet Corporation to Bulk Oil ($250,000) and the Manss company ($175,000) as reimbursement of progress payments made by those companies toward the construction of certain vessels were to be loaned to the shipbuilding companies for yard construction.

32. The total shipbuilding commitment of the New Jersey company existing on August 3, 1917, i. e., hulls designated H–201 through H–212, was placed on a cost-plus basis. At the Pennsylvania yards, the Fleet Corporation concluded cost-plus arrangements with the company for the construction of vessels identified as hulls C–15 through C–19.

33. The fact that Pusey & Jones sought and obtained loans and advances from the Fleet Corporation throughout the time it was constructing vessels for that agency is clearly inconsistent with the assertion that the shipyards had been requisitioned by the Government. So too was Pusey & Jones' action in mortgaging the shipyard property to the Fleet Corporation in May 1918. Futhermore, had there been a previous "taking" by the United States its later action in foreclos-

with the Fleet Corporation, extending over a number of years, were conducted on that basis.[34]

We therefore hold that the shipyards themselves were not requisitioned by the United States. To the extent that the United States made its presence felt in Pusey & Jones shipbuilding program, it did so for the purpose of insuring the proper construction of vessels requisitioned by the Fleet Corporation. The rights exercised by the United States were derived from the ship contracts and supplemental agreements under which it advanced funds for yard construction as well as ship construction.

The above disposes of the points set forth in a preliminary memorandum of Norway, filed with this court on July 1, 1958. However, the Convention provides for adjudication of all claims against the United States on account of damages sustained by Christoffer Hannevig relative to certain of his properties located in the United States. It is therefore proper for us to consider other acts of the United States Government in connection with the alleged Hannevig properties.

In so doing, we reach the conclusion that the only remaining complaint of injustice or illegality which Hannevig had, and Norway may now have, lies with the assertion that the Fleet Corporation failed to act legally in making an award of just compensation to the consolidated Pusey & Jones Company on March 13, 1920.

On that date the Fleet Corporation made an award to the Pusey & Jones Company of $7,194,975 as just compensation for its work in connection with the construction of vessels for the United States subject to an offset indebtedness which both parties agree was in excess of $6,500,000. The award took into account not only services performed and to be performed in the construction of ships, but also plant amortization and depreciation, and fees due the company for cancellation of 11 vessels by the Fleet Corporation. The resolution of the Fleet Corporation conferring this award further stated that the sum of $3,776,737 was to be deducted from the award, leaving a balance of $3,418,238 to be applied on the Pusey & Jones' indebtedness to the Fleet Corporation.[35] As expressed in its resolution, the Fleet Corporation's justification for this deduction was that Christoffer Hannevig, acting in part through his various companies, had prior to August 3, 1917, transferred certain ship contracts and collected, personally or through companies controlled by him, sums of money aggregating $5,627,000 which had been fully reimbursed by the Fleet Corporation to the persons or corporations in interest as of August 3, 1917.[36]

---

ing the mortgage on the Gloucester (Pennsylvania and New Jersey) properties in 1924 would have been largely unnecessary.

34. In a Delaware receivership proceeding against the consolidated Pusey & Jones company a settlement agreement was concluded in 1926 by the creditors of the company which provided that the Fleet Corporation mortgage covering the Wilmington properties (plant of the original Pusey & Jones Company) would be satisfied and discharged upon payment of $500,000. Thereafter, the receivers of Pusey & Jones, pursuant to court order, sold the shipyard properties to one Clement Smith.

35. In the language of the resolution:
"From said $7,194,975.00 there shall be deducted, and is hereby deducted, the sum of $3,776,737.00, which last-mentioned sum represents amounts which should have been applied as a part of the Pusey & Jones Company's compensation for the construction of certain of the above-mentioned vessels, but which amounts were withdrawn or withheld by Christoffer Hannevig from the assets of said company as aforesaid, leaving as a net balance to be allowed to the Pusey & Jones Company for the entire work of construction, both completed and to be completed, the sum of $3,418,238.00."

36. The resolution stated that:
"* * * the said Hannevig prior to August 3, 1917, either personally or through companies controlled by him, collected various sums of money aggregating $5,627,000.00 which sums have heretofore been fully reimbursed by the

The Pusey & Jones Company and Christoffer Hannevig were apparently willing to accept the award of $7,194,975 since the sum could have been used to satisfy the company's indebtedness to the Fleet Corporation.[37] But they strongly protested the legality of the deduction of $3,776,737. This disputed item was then the subject of several conferences between Pusey & Jones and the Fleet Corporation. The parties were unable to settle their differences, however, and on August 9, 1920, the Fleet Corporation withdrew its award.

It is argued by the Government of Norway that the Fleet Corporation was without statutory authority to make such a deduction, and, further, that the amounts collected by Hannevig were resale profits to which he was personally entitled—free of any claimed right by the shipbuilding companies or asserted

benefit by the Fleet Corporation. Norway also contends that the Fleet Corporation was without authority to revoke the award it had so made. The argument concludes with the statement that as a result of these alleged illegal activities of the Fleet Corporation Christoffer Hannevig and his various companies were forced into bankruptcy and receivership.[38]

Our answer to this contention is that Pusey & Jones, under the act of June 15, 1917, was given the opportunity to test the legality of the Fleet Corporation's determination of just compensation by accepting 75 percent of the amount found due by the Fleet Corporation and bringing an action in this court to recover any additional sum it felt entitled to in the way of just compensation.[39] Pusey & Jones did not take advantage of this remedy. See De Luca v. United States,

---

United States Shipping Board Emergency Fleet Corporation to the persons, firms, or corporations in interest as of August 3, 1917 * * *."

It went on to add that:

"* * * it now appears to the trustees of this corporation that of the said moneys so collected by Hannevig the sum of $3,776,737.00 is properly to be regarded as applicable to the just compensation which the Pusey & Jones Company is entitled to receive for work of ship construction and was, in the opinion of the trustees of this corporation, wrongfully withheld or diverted by the said Hannevig from the assets of the Pusey & Jones Company (or its predecessor companies) to his own use."

From the record it would appear that the figure of $3,776,737 was arrived at by subtracting from the $5,627,000 the sum of $1,850,263 which represented monies received by Hannevig on behalf of others for their interest in contracts requisitioned by the Fleet Corporation.

37. The award provided that the sum found due the Pusey & Jones Company was to be used in reducing the company's indebtedness to the Fleet Corporation.

The record indicates that on the date the last vessel was completed for the Fleet Corporation, September 29, 1920, the Pusey & Jones Company was indebted to the Fleet Corporation in the amount of $5,358,590.33 secured by a mortgage on the company properties, and $1,246,386.50 which was unsecured.

38. In February of 1921, Christoffer Hannevig personally, and his brokerage firm, Hannevig, Inc., were adjudicated bankrupts in New York.

On July 9, 1921, Norwegian business associates of Hannevig filed a creditors' complaint in a Delaware Federal court, placing the Pusey & Jones Company in receivership. It was not until July 14, 1926, that a final settlement was agreed to by the receivers and the creditors of the company.

39. The Fleet Corporation's resolution conferring the award provided:

"* * * that in the event the Pusey & Jones Company declines to accept the award herein and hereby made, only 75 per centum of said award shall be available to the Pusey & Jones Company, in which event 75 percent of the total award of just compensation * * * is to be applied as aforesaid in the reduction of the indebtedness of the Pusey & Jones Company to the United States Shipping Board Emergency Fleet Corporation and the said Pusey & Jones Company shall be remitted as to its claims for further compensation to the remedy provided in paragraph 3 of the emergency shipping fund provisions of June 15, 1917 (40 Stat. 182)."

1930, 69 Ct.Cl. 262, 267; Thompson v. United States, 1926, 62 Ct.Cl. 516, 528.

Even if we were satisfied that the Fleet Corporation's deduction from the just compensation award was illegal, that would not alter our basic conclusion as to the cause of Hannevig's financial misfortunes. It is our opinion that the collapse of Hannevig and his several interests was not, as Norway contends, the fault of the Fleet Corporation in its determinations in arriving at the just compensation award of March 13, 1920, or of its decision to withdraw that award on August 9, 1920. His predicament was due rather to conditions, partly of his own making, which were not attributable to the Fleet Corporation.

The possibility exists that had the United States not become involved in a war which demanded almost immediate mobilization of a large merchant fleet, a need which made the Government's extensive requisition program necessary, Hannevig's business enterprises might have survived. But that is speculation. What we do know is that the financial structure of the consolidated Pusey & Jones shipyards was never strong; that when war came to this country the shipbuilding companies were still in the process of construction; that approximately $6,500,000 was advanced by the Fleet Corporation to the companies for yard construction and operating capital; that Hannevig and the shipyards required advance payments from the Fleet Corporation for ship construction; and that the market for ships was so glutted following the end of the war, the Pusey & Jones Company was compelled to request more Government ship contracts, and accepted financial assistance from the Fleet Corporation to carry out what little private contract work it could obtain.[40]

Measured against their shipbuilding commitments existing on August 3, 1917, it would appear that the Hannevig-dominated shipyards were undercapitalized. Their success in meeting those obligations would necessarily have depended upon the resources of Christoffer Hannevig. His investment in the companies was considerable.[41] A large part of that investment came from premiums which he realized upon the sale of ship contracts that had been placed with the newly-formed shipbuilding companies.[42] So long as the demand for private shipping was great, and Hannevig was willing to divert his profits from this demand into the shipyards, Pusey & Jones, the Pennsylvania and the New Jersey shipbuilding companies enjoyed many opportunities for success. But our entry into the war, followed quickly by the Fleet Corporation's requisition program, foreclosed the satisfaction of any demand except that of the United States Government. Hannevig was no longer able to finance the yards through the sale of ship contracts placed with his American shipbuilding companies. Under the circumstances, the Fleet Corporation assisted the shipbuilding companies as best it could. It advanced considerable sums toward the completion of the shipyards; it made advance payment against the cost of ship construction; and in some instances it replaced prerequisition ship contract prices with cost-plus arrangements.

In effect the companies were only as strong as Christoffer Hannevig. That he had overextended himself is also apparent from the fact that other of his business enterprises were weakening during

---

40. A special fund was created by the Fleet Corporation from which Pusey & Jones could draw for use in its private contract work.

41. Hannevig's personal investments in the shipbuilding companies before and after August 3, 1917, totaled $6,143,125.31.

42. Norway states in its brief that every dollar received by Hannevig in the form of ship contract premiums was used to help finance the shipbuilding companies.

the war years.[43] Without additional backing from Christoffer Hannevig, his American shipbuilding companies were stretched to the breaking point. The fact that they did not break sooner was due to the financial support of the United States.

In deciding this arbitration we have found it unnecessary to pass on various technical objections raised by the United States, such as the Norwegian citizenship of Hannevig, the binding effect of his bankruptcy, the consequent assignment of his claims and the failure to exhaust local remedies.

After a thorough search of the voluminous record presented and after listening to extensive oral arguments, we have endeavored to reach and feel we have reached a just conclusion. In doing so we wish to acknowledge the assistance we have received from the skilled counsel who ably represented the two great countries involved in this proceeding. Their complete analyses, orally and in writing, of the facts and issues presented by the record were unusually helpful.

We conclude that Norway has no valid claim against the United States and, pursuant to Article II of the Convention of March 28, 1940, we so decide. The proceeding will be dismissed.

It is so ordered.

LARAMORE, MADDEN, and WHITAKER, Judges, and LITTLETON, Judge (Ret.), concur.

---

43. The names of various Hannevig companies which were unconnected with the United States' ship requisition program and the dates of their insolvency are listed as follows:

| Name of Concern | Date of Insolvency |
|---|---|
| Thor Iron Works Ltd. (Toronto) | July 17, 1918 |
| New Foundland Shipbuilding Co. Ltd. | October 18, 1919 |
| Dominion Shipbuilding & Repair Co. Ltd. | July 31, 1920 |
| Jefferson Insurance Co. | prior to February 1921 |
| Liberty Marine Insurance Co. | prior to February 1921 |
| North Atlantic Insurance Co. | prior to February 1921 |