**Stephen BISTLINE et al.**

v.

**The UNITED STATES.**

**No. 296–77.**

United States Court of Claims.

Jan. 28, 1981.

---

Thomas A. Mitchell, Coeur d'Alene, Idaho, attorney of record for plaintiffs.

Dorothy R. Burakreis, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and KUNZIG and SMITH, Judges.

## ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

COWEN, Senior Judge:

Plaintiffs brought this action to recover damages of $195,000 for the alleged inverse condemnation of 6.4 acres of lakefront property owned by them on Lake Pend Oreille in Northern Idaho. Plaintiffs claim that the construction and operation of the Albeni Falls Dam Project (hereafter the project) by the Corps of Engineers have caused their property to wash away or

erode since they purchased it in 1970, some 18 years after the project was put in operation. Specifically they assert that the taking of their property was effected in January of 1972 and June of 1974 by the operation of the project, when adverse storm winds coupled with project waters, cut away the banks of plaintiffs' land above the limits of the flowage easement held by the government and washed portions of their property into the reservoir maintained by the Corps of Engineers. According to plaintiffs, one acre of their land has been washed away. The facts essential to the disposition of this case on the motions for summary judgment are not in dispute. For the reasons to be set forth, we find that there was no Fifth Amendment taking of plaintiffs' property and that defendant's cross-motion for summary judgment should be granted.

I.

The Albeni Falls Dam and Reservoir Project was authorized by the Flood Control Act of May 17, 1950, Pub.L. 516, 81st Cong. 2d Sess., for the regulation of Lake Pend Oreille and for the associated purposes of flood control, navigation, conservation, recreation, and power generation as a part of a comprehensive plan of improvement for the Columbia River system.

The project included a concrete gravity structure with a spillway section occupying the left channel of the Pend Oreille River and a powerhouse. The normal full reservoir pool was established at elevation 2,062.5 feet above mean sea level (m.s.l.). In Senate Document No. 9, 81st Cong., 1st Sess., a report entitled "Improvement At Albeni Falls On The Pend Oreille River, Idaho," it was stated that elevation 2,062.5 feet would be the maximum regulated elevation of Pend Oreille Lake. The report also stated:

Of the total reservoir area at elevation 2,062.5, only some 6,300 acres lie outside the existing meander lines of Pend Oreille Lake and River. These are to be acquired for project purposes. Some additional area will be required for free-

board along the shores of the reservoir to provide against wave wash, ground-water effects, and special severance damages.* * *

It was estimated that the spillway, as designed, would reduce "by amounts up to 1.5 feet the flood levels of Pend Oreille Lake for all floods which, under natural conditions, would cause lake stages between elevation 2,062.5 and elevation 2,076.1 * *."

This history of the area shows that such floods as those which occurred in 1894 and 1948 reached elevations in excess of 2,067.5. In those years, the elevation of the Lake reached 2,075.88 and 2,071.62 feet respectively. If those floods had occurred under post-project conditions, the maximum Lake level would have been 1 to 2 feet lower.

It is undisputed that since the project was completed, it has continuously been operated within the limits authorized by Congress. The project went into operation in 1952. Since that time, the Lake elevation has not, through operation of the Albeni Falls Dam, exceeded 2,062.5. The maximum elevation of the Lake since the project was completed was 2,065.72 feet; this occurred on June 12, 1972, when the gates of the Dam were fully open and the project was not controlling the Lake discharge. The level of the Lake was lower then than it would have been without the Albeni Falls Dam.

On May 21, 1952, through a document entitled "Warranty Easement," the government acquired from George and Emma Munding, plaintiffs' predecessors in title, a flowage easement on the land in issue here. The area covered by the government's easement included the entire 6.4 acres of land by metes and bounds, and thus the description was sufficient to include lands lying above elevation 2,067.5 feet. The easement acquired from the Mundings by the government provided in pertinent part as follows:

Said right of way and easement are for the following purposes and in accordance with the following terms and conditions:

The full perpetual right, power, privilege and easement to intermittently over-

flow, flood and submerge those portions of the hereinabove described lands lying above elevation 2062.5 feet above mean sea level, United States Coast and Geodetic Survey Datum, with waters of Lake Pend Oreille, the Pend Oreille River and their tributaries and for any length of time to impound upon, overflow, flood and submerge those portions of the hereinabove described lands lying below elevation 2062.5 feet above mean sea level with the waters of Lake Pend Oreille, the Pend Oreille River and their tributaries, all in the construction, operation and maintenance of the Albeni Falls Dam, its appurtenances, reservoir and overflow areas.

\*   \*   \*   \*   \*   \*

The Grantors in consideration of the specified sum above written, do hereby release the United States of America, and its assigns, from all claims for damages that have accrued or may hereafter accrue to any or all of the above described lands by reason of the overflow of water occasioned by the construction and operations of the said Albeni Falls Project on the Pend Oreille River, Idaho, or by the exercise of any or all of the rights, powers, privileges and easements hereinabove granted.

And the above named Grantors, do hereby covenant that the above described premises are free from all encumbrances and that they will and their heirs, executors and administrators shall warrant and defend the above premises against all lawful claims and demands except: Existing easements for public roads and highways, for public utilities, for railroads and pipelines. Provided, however, that the above warranty provision shall not apply to Grantors' interests in lands not specifically described above and assigned acreages.

The United States of America and its assigns, by the acceptance of this grant, do agree that there is hereby reserved to Grantors, their heirs or assigns, all such rights and privileges in and to the above described lands as may be used and enjoyed without interfering with or abridging the rights and easements herein granted, provided that no dwelling or other structure maintain for human habitation or occupancy on the above described lands shall have a first floor elevation of less than 2067.5 feet above mean sea level.

In June 1970, plaintiffs acquired the land, subject to the government's flowage easement, for the sum of $20,200. No survey of the property was conducted by plaintiffs prior to 1974.

## II.

In an effort to overcome the formidable obstacle presented by the easement granted by the Mundings, plaintiffs have submitted a number of affidavits. The affiants include former government attorneys, the plaintiff Stephen Bistline, and a private practitioner. All of the affidavits relate to condemnation actions and settlement negotiations involving other lands upon which easements for the operation of the project were acquired at other times. The purport of these affidavits is that in the acquisition of such other easements, it was the government's position and the understanding of the landowners that the amounts paid for the easements were to compensate the owners for the actual flooding and taking of the land lying below an elevation of 2,062.5 feet m.s.l.; that the easements taken in the area between elevations of 2,062.5 and 2,067.5 feet were primarily intended to provide compensation for any erosion that would result from wave action and that it was not contemplated that there would be a taking of the land above 2,062.5 feet through intermittent flooding. Also, it was not considered that there would be any possibility of damage to or taking of land above an elevation of 2,067.5 feet as a result of flowage of waters, wave action or erosion. The affidavit of plaintiff, Stephen Bistline, contains similar statements; in addition, he avers that there never was any contention by the government that it acquired any right whatever to any property above elevation of 2,067.5 feet.

■ It is quite clear that these affidavits are in conflict with the unequivocal language of the easement which, as shown above, granted to the government the perpetual right to intermittently overflow, flood and submerge all of the subject land lying above elevation 2,062.5 feet m.s.l. The release clause did not specify that the right to the intermittent flooding of the land was limited to a specific contour elevation. On the contrary, the release applies to all of the land, including that below and above elevation 2,062.5 feet m.s.l. The release is couched in comprehensive terms. It relieved the government "from all claims for damages that have accrued or may hereafter accrue to any or all of the above described lands by reason of the overflow of water occasioned by the construction and operation" of the project. The language of the easement is complete and unambiguous and there is no contention that it was executed as the result of fraud, accident, or mistake. Consequently, the parol evidence rule forbids the admission of the evidence contained in plaintiffs' affidavits, as well as the consideration of such evidence in ruling on the motions for summary judgment.[1] *Sullivan v. United States,* 363 F.2d 724 (8th Cir. 1966), *cert. denied* 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622 (1967); *Rice v. Trunkline Gas Co.,* 323 F.2d 394 (7th Cir. 1963); *In Re Norway and United States,* 145 Ct.Cl. 470, 483, 172 F.Supp. 651, 659 (1959); *Mason, et al. v. United States,* 144 Ct.Cl. 579, 584, 169 F.Supp. 507, 510 (1959). *See also Arizona v. California,* 292 U.S. 341, 54 S.Ct. 735, 78 L.Ed. 1298 (1942).

In similar situations involving easements acquired by political subdivisions or public utilities, the highest courts of several states have held, as we hold here, that a court is required to determine the legal effect of the easement from the terms thereof without resort to parol or extrinsic evidence. *Southern Furniture Mfg. Co. v. Mobile County,* 276 Ala. 322, 161 So.2d 805 (1963); *Lucas v. Algonquin Gas Transmission Co.,* 143 Conn. 350, 122 A.2d 588 (1956); *White County v. Wooten,* 219 Ga. 236, 132 S.E.2d 653 (1963); *Cuneo v. City of Chicago,* 400 Ill. 545, 81 N.E.2d 451 (1948).

We think that *United States v. 2,648.31 Acres of Land, etc.,* 218 F.2d 518 (4th Cir. 1955), upon which plaintiffs rely, is clearly distinguishable on its facts. That case involved an appeal by the United States from a district court judgment awarding compensation from the condemnation of flowage easements over three tracts of land in connection with a flood control project. The district court held that the landowners were entitled to recover the full fee simple value of each tract and excluded testimony offered by the government to show that the decrease in the value of the tracts as a result of the flowage easements would be considerably less than the full fee simple value. The declaration of taking had attached thereto a plan showing that with the spillway gates closed the dam would be at an elevation of 320 feet. The government offered a report by the Corps of Engineers showing that the land above elevation 310 feet would be inundated so rarely that it could be used for farming. The offer of proof included a map showing the 320-foot contour on the three tracts in issue, which disclosed that no part of one tract was below that level and that only small portions of the other tracts were below it. The government also offered to prove that it would be impossible physically to overflow the three tracts permanently, and that it would be physically impossible to overflow even a portion of the land intermittently to any greater extent than that to which the lands had always been subject by natural flooding. The court of appeals held that the district court erred in refusing to admit such testimony in determining the proper measure of compensation for the taking of the flowage easements. In that case, the excluded evidence was offered in the very action in which the government sought to

---

1. The parol evidence rule applies not only to the parties to the written instrument but to their privies and to those whose rights depend upon the instrument. *Pugh v. C.I.R.,* 49 F.2d 76, 79 (5th Cir. 1931), *cert. denied,* 284 U.S. 642, 52 S.Ct. 22, 76 L.Ed. 546; *Jurs v. C.I.R.,* 147 F.2d 805, 810 (9th Cir. 1945). *Cf. O'Shea v. N.Y.R.R. Co.,* 105 F. 559 (2d Cir. 1901).

acquire the flowage easements. Here, some 28 years after the United States acquired the easement before us, plaintiffs have launched what amounts to a collateral attack in which the terms of the easement would be contradicted by parol evidence relating to the position of the government and the understanding of landowners in the trial and settlement of condemnation actions involving other lands, other landowners, and other times. In the Fourth Circuit case, the declaration of taking showed that the land to be covered by the flowage easements was that which was situated below a contour line of 320 feet above sea level. Here the plain terms of the easement cover all of the land in the 6.4 acre tract, including that which lies both below and above an elevation of 2,062.5 feet. Of controlling significance, moreover, is the fact that the Fourth Circuit was not confronted with an unconditional release such as that relied upon by the defendant in this action.

■ We conclude, therefore, that plaintiffs' right to recover is barred by the easement containing the release granted by plaintiffs' predecessors in title, and that no compensation is due plaintiffs for the claimed Fifth Amendment taking.

### III.

We think there is another ground upon which defendant is entitled to summary judgment.[2] It is an uncontested fact that at all times since the project began, it has been operated within the limits authorized by Congress. Since 1952, when the dam was completed, the Lake elevation has not exceeded 2,062.5 feet m.s.l. as a result of the operation of the Albeni Falls Dam.

■ By an affidavit executed by the Chief, Hydrology and Hydraulics Branch, Engineering Division, Seattle District, United States Army Corps of Engineers, who is the custodian of the hydrology and hydraulics records for the Seattle District in which the land in issue lies, it has been established that on June 12, 1972, the elevation of the Lake reached 2,065.72 feet, at a time when the gates of the dam were fully open and that the level of the lake was then lower than it would have been without the dam. The same affidavit shows that the historical floods, such as those which occurred in 1894 and 1948, reached elevations in excess of 2,067.5 feet, and that in those years the resulting elevations of the Lake were 2,075.88 and 2,071.62 feet respectively; that if the same floods had occurred under post-project conditions, the maximum Lake level would have been 1 to 2 feet lower. Thus, it has been shown that the operation of the dam has not increased the elevation of floods on the Lake and adjacent lands. There is no contention that the dam has increased the frequency or duration of flooding on the land bordering on the Lake.

In view of these facts, it is the explicit holding of the Supreme Court that plaintiffs are not entitled to recover for a Fifth Amendment taking. *United States v. Sponenbarger*, 308 U.S. 256, 266, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939).

In two recent decisions of this court which cited and relied upon *Sponenbarger*, we held that the landowner was not entitled to recover for a Fifth Amendment taking where the intermittent flooding of his land was not increased in elevation, frequency, and duration as a result of the government's project and the operation of its dam. *Ark-Mo Farms, Inc. v. United States*, 209 Ct.Cl. 116, 530 F.2d 1384 (1976); *Hartwig v. United States*, 202 Ct.Cl. 801, 811, 485 F.2d 615, 621 (1973). *See also, Christman v. United States*, 74 F.2d 112 (7th Cir. 1934) and *Matthews v. United States*, 87 Ct.Cl. 662, 715 (1938).

The affidavit of January 8, 1980, by plaintiff Stephen Bistline, states:

* * * The various properties and types of properties which are the shoreline of the

---

**2.** Relying on *United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), defendant argues that the Mundings (from whom the easement was acquired), rather than plaintiffs, are the only persons who have the right to any additional compensation that might be due as a result of flooding the land pursuant to the flowage easement. Since the case has been disposed of on other grounds, we do not decide this question.

lake from time before the memory of man were sporadically subjected to annual peak snowmelt run-off waters which exceeded the reservoir pool level of 2062.5 feet. The spring run-off waters overflowed the land above 2062.5 feet, and, within the memory of man, receded below that level some two to three weeks later—and so far as is known, working no destruction of the lands littoral to the lake.

■ We find that this affidavit is not sufficient to controvert the facts specifically set forth in the affidavit of defendant's engineer, as custodian of the hydrology and hydraulic records maintained by the Corps of Engineers for the district in which the land is located. The statements in plaintiff's affidavit are very broad and general, referring to events occurring "before the memory of man" and "within the memory of man." Moreover, Mr. Bistline's affidavit of August 31, 1979 shows that he first became a resident of the county where the land is located in 1952. Obviously, it would have been impossible for him to acquire the knowledge contained in the historical records maintained by the Corps of Engineers and reflected in the affidavit of defendant's engineer. In the latter's affidavit, it is specifically stated, as shown above, that if the big floods of 1894 and 1948 had occurred after the dam was constructed, the Lake level would have been lower than it would have been without the dam.

Thus, we find that the damages claimed because of the erosion of plaintiffs' land are consequential damages and that no compensable taking resulted from the construction and operation of defendant's project.

### IV.

It follows from the foregoing opinion, that plaintiffs' motion for summary judgment should be, and it is hereby, denied. Defendant's cross-motion for summary judgment is granted, and plaintiffs' petition is dismissed.