**PETERSON–SHARPE ENGINEERING CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 455–82C.

United States Claims Court.

Sept. 4, 1984.

---

Laurence Schor, Washington, D.C., for plaintiff. Schnader, Harrison, Segal & Lewis, Washington, D.C., of counsel.

George M. Beasley, III, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. Bert P. Pettinato, Army Corps of Engineers, of counsel.

## OPINION

MAYER, Judge.

Plaintiff Peterson-Sharpe Engineering Corporation (Peterson-Sharpe) seeks review of a decision of the Armed Services Board of Contract Appeals (Board) under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322. The case is here on cross-motions for summary judgment and the stated facts are findings of the Board or otherwise properly derived from the administrative record. *See Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 609 F.2d 462, 465 (1979).

## FACTS

In June of 1963, Peterson-Sharpe was awarded Contract No. DA–92–800–ENG–869 (Contract 869) for the construction of two aircraft warning sites in South Korea. The fixed price contract contained the standard provisions for convenience terminations and disputes. Peterson-Sharpe provided the construction expertise and management for Contract 869 and contracted with others to supply materials and labor for on-site work. On July 3, 1963, it entered into two agreements with Lance International, Inc. (Lance), which had advised Peterson-Sharpe on Contract 869 prior to award. In one contract, they agreed that Peterson-Sharpe would purchase all United States materials for Contract 869 from Lance and receive 90 days' credit for those purchases. In the other contract, they set out their understanding about the advisory services to be performed by Lance and a payment schedule for them. Neither contract said anything about the payment of interest, and each contained a statement that the document was the entire agreement of the parties and not subject to any further conditions. Both contracts were signed by Carl Parker, president of Peterson-Sharpe, and A.M. Hochstadt, vice presi-

dent of Lance and a member of the family that owns the company.

During November or early December of 1963, Peterson-Sharpe ordered about $180,000 worth of materials from Lance for another government contract in Okinawa, even though it had not paid Lance for materials delivered earlier. Upset by this, Hochstadt flew to Okinawa to investigate. In meetings with Parker and the contracting officer, he learned that Peterson-Sharpe was in serious financial trouble. Armed with this information, Hochstadt met with Charles Peterson, who owned a controlling interest in Peterson-Sharpe, to propose a plan to protect Lance's interests.

Hochstadt's plan was essentially adopted in an agreement executed on December 21, 1963. Hochstadt was given a two year option to purchase 1,740 shares of Peterson-Sharpe stock from Peterson at a penny a share, and all voting rights in the stock during this period were given to a designated attorney who would select a competent person to run the company. Hochstadt did not exercise his right to purchase the stock, but Harlan Grosshans was hired within several weeks of the agreement to replace Parker as president of Peterson-Sharpe.

In March of 1965, Contract 869 was terminated for the convenience of the government because of substantial contract revisions and the parties' inability to agree on a price for the revised work. Thereafter, Grosshans resigned as president of Peterson-Sharpe and gave Hochstadt a power of attorney to prosecute the company's termination claim. All of Peterson-Sharpe's records for Contract 869 were shipped to Lance, and in September of 1965 a termination claim was submitted.

From 1965 to 1971, extensive audits of Peterson-Sharpe's claim, which included claims of its subcontractors, were conducted, and settlement was discussed. Progress on the claim was hindered, however, by the former project engineer for Contract 869 who withheld ledgers and other financial records pending payment of back wages. During this period, Grosshans returned as president of Peterson-Sharpe, but relied on Hochstadt to pursue the termination claim.

In May and June of 1971, almost six years after their original claim was filed, revised termination claims were submitted for Lance and Peterson-Sharpe seeking interest of 6% per year compounded annually. This was the first time they had asked for interest. The revised claims were audited and the interest was questioned.

Late in 1972, Hochstadt and defendant agreed on a settlement proposal, but Grosshans refused to sign it when he discovered that some funds owed to him were not included. Negotiations continued sporadically until March 1973 when the parties agreed to settle all of the termination claims, except those for interest which were expressly reserved. The contracting officer issued a final decision under the disputes clause denying the interest claims and Peterson-Sharpe filed a timely appeal.

During the evidentiary hearing before the Board, Hochstadt testified that he and Parker negotiated the July 3, 1963, contracts between Lance and Peterson-Sharpe which say nothing about interest. He said it was Lance's practice never to put interest agreements in writing. When asked about the statement in the contracts saying they were the parties' entire agreements and not subject to further conditions, Hochstadt replied that the statement "had no relation to interest," but "to other terms and conditions and things like that."

On the materials contract, Hochstadt said that Peterson-Sharpe agreed to pay interest at ½% flat, plus 7½% per year from the date of invoice until paid. He added that the parties agreed to the same interest rate for the advisory services contract in the event Peterson-Sharpe did not adhere to the contract's payment schedule. Hochstadt said the company's new president, Grosshans, agreed to revise the interest rate to ½% flat, 7½% for the first 90 days, and 1% per month thereafter, when Peterson-Sharpe failed to make its first payment on the advisory services contract. In explaining why the original terms were not firm, he said, "If decided at a later date

that we [Lance] wanted a different rate, we would tell them what we wanted. They would agree with it or they would agree with it. I meant what I said. They really had no choice." When asked why interest at 6% had been requested in the 1971 termination claim, rather than the higher amount allegedly agreed upon, Hochstadt said that Lance had been advised by a consultant that the government pays interest at a rate of 6%.

Grosshans testified that Peterson-Sharpe financed its government contracts through its subcontractors. Each subcontractor was chosen because it could carry its accounts receivable for services and materials furnished until Peterson-Sharpe was paid by the government. When asked about the contracts with Lance, Grosshans said he was told by Parker that Peterson-Sharpe would have to pay interest at the rate of 7½% per year and ½% flat, the latter rate meaning there was a one time charge of ½% of the amount owed on the due date. Grosshans added that when Peterson-Sharpe was unable to make its payments to Lance on the advisory services contract, he agreed to increase the interest rate from 7½% per year to 1% per month on that contract until Lance was paid. But the agreement was not reduced to writing. Grosshans denied making any agreement to pay interest at 1% per month on the materials contract.

Among the exhibits introduced before the Board was a five page document purporting to represent four separate transactions prior to Contract 869 in which Lance collected interest from Peterson-Sharpe, and a copy of a complaint filed by Lance in a New York state court in 1974. In paragraph seven of the complaint, Lance stated that Peterson-Sharpe had agreed to pay interest at the rate of ½% flat on the value of all goods sold and services rendered, or on money advanced or expended by Lance in connection with Contract 869, 7½% per year for the first ninety days after the date money was due to Lance, and 1% per month thereafter until paid in full.

The Board concluded that Peterson-Sharpe failed to prove by a preponderance of the evidence that it was obligated to pay interest to Lance, a prerequisite to government liability for interest costs under any theory of plaintiff's case. The Board held that the "evidence of record, or more particularly, the lack of it compels the conclusion that the written agreements dated July 3, 1963, were intended as complete integrations of the provisions agreed to at that time." The Board observed that Hochstadt was the only party to the alleged 1963 interest agreements to testify at the hearing and that Parker, the logical person to corroborate his testimony, did not appear. It noted that Hochstadt, as a corporate officer and member of the family which owned Lance, had a substantial personal interest in the outcome of the case because Lance was the real party in interest. The Board gave Grosshans' testimony about the initial rate of interest in the 1963 agreements little weight because he had not been present when the purported agreements were made. It also concluded that the five page document introduced was not helpful because it did not show a sequence of prior conduct between Lance and Peterson-Sharpe about the payment of interest.

The Board found it was improbable that a sophisticated businessman like Hochstadt would neglect to reduce an oral interest modification to writing when he was aware of Peterson-Sharpe's imminent insolvency and financial collapse. On the other hand, the agreement between Hochstadt and Peterson, which allowed Hochstadt to assume control of Peterson-Sharpe for the nominal sum of $17.40, was in writing. Grosshans' acquiescence in the alleged oral interest modification was also thought contrary to prudent business practice. The Board observed that the testimony of Grosshans and Hochstadt about the alleged modification of the materials contract was contradictory and uncorroborated by independent evidence. It concluded therefore that it need not accept their testimony at face value, and that the inadequately explained six year delay in asserting the interest claim

could only be interpreted as a signal that neither party recognized an obligation by Peterson-Sharpe to pay interest to Lance.

## CONTENTIONS

Plaintiff says there is no evidence in the record to support the finding of no interest agreement, but sufficient evidence to support the opposite conclusion. It argues that the Board arbitrarily ignored documentary evidence which established a course of dealing between Peterson-Sharpe and Lance with respect to interest; substituted its business judgment for that of the parties; and discredited uncontradicted testimony by Hochstadt and Grosshans, even though the Board member who wrote the decision did not observe their demeanor at the hearing, and the member who did, did not participate in the decision. Plaintiff also says the Board erred as a matter of law in its conclusions on the parol evidence rule. It should not have allowed a stranger to the contract to invoke the rule, or applied the rule to the alleged modification of the interest rate, an independent agreement with its own consideration.

Defendant responds that the Board's conclusions on the parol evidence rule are correct, and that the integration clauses in the contracts and the silence about interest, as well as plaintiff's belated assertion of the claim, amount to substantial evidence that there was no interest agreement. The Board properly rejected the testimony of Hochstadt and Grosshans as incredible and uncorroborated.

## DISCUSSION

■ Under the Wunderlich Act, a board's determinations on questions of law are not binding on the court, but will be credited if reasonable and based on a board's expertise. *See Flexible Metal Hose Manufacturing Co. v. United States,* 4 Cl.Ct. 522, 527 (1984); *Dale Ingram, Inc. v. United States,* 201 Ct.Cl. 56, 475 F.2d 1177, 1185 (1973). A board's findings of fact, however, are binding on the court unless shown to be arbitrary, capricious or not supported by substantial evidence. *See*

*Flexible Metal Hose Manufacturing Co. v. United States,* 4 Cl.Ct. at 527; *Koppers Co. v. United States,* 186 Ct.Cl. 142, 405 F.2d 554, 557 (1968).

*Standard of Review*

Plaintiff argues that the court should apply a more stringent standard of review to the Board's findings of fact than is usual because the officer who presided over the hearing did not participate in the decision. Plaintiff does not suggest the Board was improperly constituted, but that it acted arbitrarily in discrediting favorable testimony when the panel rendering the decision had no opportunity to observe the demeanor of the witnesses.

■ There is no rule that a board decision be rendered by the individual who presided at the hearing. *Tri-Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112, 116 (1972); *Anthony P. Miller, Inc. v. United States,* 161 Ct.Cl. 455, 474 n. 11 (1963). Therefore, the failure of the author of the decision to attend the hearing does not alter the applicable standard of review. *Ordnance Research, Inc. v. United States,* 609 F.2d at 473; *Tri-Cor, Inc. v. United States,* 458 F.2d at 117; *Sundstrand Turbo v. United States,* 182 Ct.Cl. 31, 389 F.2d 406, 410 (1968).

As discussed in *Sternberger v. United States,* 185 Ct.Cl. 528, 401 F.2d 1012, 1017 (1968), a subordinate administrative officer may preside over the presentation of evidence as long as the officer charged with the duty of deciding considers the evidence. *See also Sea-Gate, Inc. v. United States,* 1 Cl.Ct. 699, 702 n. (1983); *Racine Screw Co. v. United States,* 156 Ct.Cl. 256, 258 (1962). Under these circumstances, an opinion written by a member other than the one who presided at the hearing is not a failure of due process. *See Tri-Cor, Inc. v. United States,* 458 F.2d at 117; *Sternberger v. United States,* 401 F.2d at 1017. In this case, the Board's findings demonstrate that it reviewed the evidence compiled by the hearing officer. A court reviewing a decision may occasionally note that the author

below was in no special position to judge credibility, *see Ordnance Research v. United States*, 609 F.2d at 473, but as discussed below Hochstadt's testimony was found implausible in light of other facts in the administrative record. *See Dittmore-Freimuth Corp. v. United States*, 182 Ct.Cl. 507, 390 F.2d 664, 685 (1968). So the absence of the hearing officer from the deciding panel is not relevant.

■ Defendant says the court should apply a less stringent standard of review to the Board's findings than usual because of plaintiff's unexplained delay in raising its claim. Plaintiff should sustain a heavier burden to overturn the Board's findings because it waited almost six years to seek review of them. Defendant relies on *B–W Construction Co. v. United States*, 100 Ct.Cl. 227, 236 (1943), where the court ruled as an evidentiary matter that the plaintiff must sustain "a somewhat heavier burden in proving its case than usual" because of its unexplained delay in bringing suit. Our defendant, however, has not suggested it was prejudiced by plaintiff's delay or materially harmed in presenting its case. *See Kaiser Aluminum & Chemical Corp. v. United States*, 181 Ct.Cl. 902, 388 F.2d 317, 320 (1967). Even if it had, the court cannot alter its standard of review in a Wunderlich Act case based on a 1943 evidentiary ruling. *See id.*

### Correctness of Legal Conclusions

■ Plaintiff believes the Board's decision is deficient because it rejected Hochstadt's "uncontroverted" testimony. Defendant presented no witnesses to contradict Hochstadt's assertions about an oral interest agreement, but there is evidence in the record in conflict with his testimony. The July 3, 1963, contracts contain no provisions for the payment of interest and purport to be the parties' entire agreements. The record also shows that plaintiff first claimed interest at the rate of 6%, but Hochstadt testified that he and Parker agreed to a higher rate. Even the testimony of Grosshans, plaintiff's own witness, contradicted that of Hochstadt. Hochstadt

said that the interest rate on the materials subcontract was modified, but Grosshans said twice during the hearing that it was not. Hochstadt's testimony, therefore, was not uncontroverted.

Plaintiff implies that Hochstadt's testimony was rejected by the Board as self-serving and argues that even the testimony of an interested witness must be given weight. The Board did observe that Hochstadt had a substantial interest in the outcome of the litigation, but it did not for that reason reject his testimony. Rather, it determined his testimony was implausible. For example, when Hochstadt learned of Peterson-Sharpe's serious financial difficulties, he executed a written contract with Charles Peterson to protect Lance. Yet during the same period, he says he failed to memorialize in writing the parties' modifications of their alleged oral interest agreements. The Board found it inherently improbable that an experienced businessman like Hochstadt would not reduce the modification of an interest agreement to writing when he was aware of plaintiff's financial difficulties and had executed another contract to protect Lance.

The record contains ample support for the Board's determination of implausibility. Ordinarily, an agreement to pay interest on contracts for the sale of materials and services requires explicit terms, but Hochstadt's testimony provided few details other than the alleged rates of interest and even that was not precise. Hochstadt claimed the parties agreed to a particular rate of interest, but Lance could decide later that it wanted a different rate and Peterson-Sharpe would have no choice but to pay it. He also said the contract with Charles Peterson which allowed him to buy a controlling interest in Peterson-Sharpe for $17.40 and designate an attorney who would select a new president for the company did not affect Lance's relationship with Peterson-Sharpe.

What Hochstadt failed to say also contributed to the implausibility of his testimony. The record shows he was given a power of attorney to prosecute plaintiff's

termination claim, but Hochstadt never explained why he waited almost six years to first assert entitlement to interest as part of it. The record, therefore, shows the testimony was inherently implausible, even coming from a witness with the most persuasive demeanor. As was said in *Sternberger v. United States*, 401 F.2d at 1016–17:

> Exaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision and errors may all breed disbelief and therefore the disregard of even uncontradicted non-opinion testimony. *Quock Ting v. United States*, 140 U.S. 417, 420–21 [11 S.Ct. 733, 35 L.Ed. 501] (1891); *Duwamish v. United States*, 79 Ct.Cl. 530, 576 (1934). Such testimony ... "carries its own death wound." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 161 F.2d 798, 800 (5th Cir.1947).

*Accord, White Glove Building Maintenance, Inc. v. Brennan*, 518 F.2d 1271, 1273–74 (9th Cir.1975).

Plaintiff does not disagree that incredible testimony may be rejected, but argues that the Board's theory of the case is more incredible than Hochstadt's testimony. It would be more implausible for a prudent businessman to lend money for a protracted period of time without requiring the payment of interest than to have an oral interest agreement. Plaintiff, however, misconstrues the facts. This was not a loan transaction in which Peterson-Sharpe borrowed money from Lance; it was one in which Lance sold services and materials to Peterson-Sharpe and claims interest on the unpaid bills for them. The Board did not say all oral interest agreements are incredible, only that on this record Hochstadt's testimony was implausible. Inferences are for the Board, the trier of fact. The court will not reach a different conclusion when the inferences are supported by the record as they are here. *Contract Master Services, Inc. v. United States*, 225 Ct.Cl. 735, 737 (1980); *Sternberger v. United States*, 401 F.2d at 1017; *Dittmore-Freimuth Corp. v. United States*, 390 F.2d at 685.

■ The Board's rejection of Grosshans' testimony about an interest agreement is likewise supported by the record. Though Grosshans testified that Peterson-Sharpe's subcontractors were chosen because they could carry their accounts receivable, he said he was told by Parker that there was an oral interest agreement with Lance. Grosshans said he agreed to increase the rate of interest on one contract, but Hochstadt testified that Grosshans agreed to do so on both contracts. The rate Grosshans said he agreed to is not the same rate Peterson-Sharpe used in its belated interest claim submitted after Grosshans had returned as president of the company. Defendant notes that Grosshans was appointed president of Peterson-Sharpe as a result of Hochstadt's December 1963 agreement to protect Lance and suggests that Grosshans' possible bias was not lost on the Board. Whether or not the Board believed Grosshans was an interested party, it was not improper to discount his testimony.

Plaintiff also argues that the Board erred in applying the parol evidence rule. It should not have allowed the rule to be invoked by defendant, a stranger to the contract, or applied the rule to the interest agreement, a distinct contemporaneous contract supported by separate consideration.

■ The parol evidence rule is not a rule of evidence, but one of substantive law. *David Nassif Associates v. United States*, 214 Ct.Cl. 407, 557 F.2d 249, 256 (1977); *Sylvania Electric Products, Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972). It prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement that has been adopted by the parties as an expression of their final understanding. *David Nassif Associates v. United States*, 557 F.2d at 256; *Butz Engineering Corp. v. United States*, 204 Ct.Cl. 561, 499 F.2d 619, 629 (1974). The rule operates not only for the benefit of the parties to a contract, but to protect all whose rights depend on the instrument. *See Bistline v. United States,*

226 Ct.Cl. 282, 640 F.2d 1270, 1274 n. 1 (1981).

In this case the Board correctly decided that the evidence of record, or the lack of it, compels the conclusion that the written contracts were intended as complete integrations. The contracts clearly set forth the payments to be made by Peterson-Sharpe and that they were the entire agreements. *See Herman v. United States*, 229 Ct.Cl. 475, 477 (1981). There is no credible evidence to the contrary. "The written contract merged all previous negotiations, and is presumed, in law, to express the final understanding of the parties. If the contrct did not express the true agreement, it was the claimant's folly to have signed it." *Herman v. United States*, 229 Ct.Cl. at 476, *quoting Brawley v. United States*, 96 U.S. (6 Otto) 168, 173–74, 24 L.Ed. 622 (1877).

Plaintiff's argument in the alternative, that the interest agreement was a distinct contemporaneous contract supported by separate consideration to which the parol evidence rule does not apply, also fails. The Board found that there was no interest agreement between the parties and the finding is supported by substantial evidence as discussed below. The Board did not exclude any evidence of a distinct contemporaneous agreement under the parol evidence rule, but rejected what little evidence was offered by plaintiff as incredible.

Finally, plaintiff complains that the Board erred as a matter of law when it observed that Parker, the logical witness to corroborate Hochstadt's testimony, failed to appear, and that plaintiff's nearly six year delay in asserting an interest claim indicated neither party recognized an interest obligation. Plaintiff argues that these issues were not raised by defendant or the presiding member and it was, therefore, improper for the Board to deduce a negative inference.

Although plaintiff's witnesses at the hearing referred to Parker in the present tense, plaintiff says he had been dead for ten years. It correctly states that an inference adverse to a party may be drawn from the failure of a witness within the party's control to testify. *Contract Master Services, Inc. v. United States*, 225 Ct.Cl. at 737. But Parker was not. Defendant responds that plaintiff should have moved the Board for reconsideration if it believed the decision was based on Parker's failure to testify and suggests that plaintiff is trying to shift the burden of establishing the reason for Parker's absence to the presiding Board member.

Careful study of the Board's decision shows that any negative inference drawn from Parker's failure to appear was not central to its determination. The court concludes it would have reached the same decision even if it had been apprised of his death. *See Contract Master Services, Inc. v. United States*, 225 Ct.Cl. at 738. Even if it were otherwise, it is not unreasonable for the Board to have drawn an inference adverse to plaintiff from the absence of a witness it could logically expect to be produced. After all, the last it knew he was plaintiff's departing president. It was incumbent on plaintiff to explain his absence or endure the foreseeable consequence. There was no error in the Board's observation about Parker.

Plaintiff says the Board's use of the six year delay in asserting an interest claim to impose a heavier burden of persuasion was improper because it was not given an opportunity to explain the delay. Relying on *Kaiser Aluminum & Chemical Corp. v. United States*, 388 F.2d at 319, where the court declined to apply laches in a contract action, plaintiff suggests the case be remanded for a hearing on this point.

In this case, defendant did not raise the doctrine of laches. It merely argued that plaintiff's belated filing of the interest claim precluded recovery because Contract 869 required that all convenience termination claims be submitted within one year of the termination. The Board, however, declined to bar plaintiff's interest claim as late because it found that even if the claim were treated as an element of the

initial claim, plaintiff had failed to meet its burden of proof. A claim may not be barred but it will carry a heavier burden of persuasion if it was dilatory. Plaintiff's delay could only be interpreted as a sign that neither party recognized an obligation to pay interest. The course of actual conduct is persuasive of what they understood their written contract to mean. *See Ables v. United States*, 2 Cl.Ct. 494, 501 (1983), *aff'd mem.*, 732 F.2d 166 (Fed.Cir.1984); *Macke Company v. United States*, 199 Ct.Cl. 552, 467 F.2d 1323, 1325 (1972). It was not improper for the Board to infer that plaintiff's failure to pay interest or present an interest claim for almost six years meant that neither party recognized an interest obligation. Plaintiff had ample opportunity to respond to defendant's argument about its tardy claim; it may not argue the issue again before the Board.

### Evidence to Support Findings

██ Plaintiff also challenges the Board's findings of fact as not supported by substantial evidence. It says the Board "failed to muster a 'scintilla' of evidence ... in support of its conclusion that plaintiff and Lance did not have oral interest agreements." Plaintiff adds that the "Government did not introduce one iota of evidence to establish that there were no oral interest agreements," and "all of the evidence in the record uniformly and without contradiction establishes that there were such interest agreements." The question then is whether there is substantial evidence to support the Board's finding or, stated negatively, whether there is evidence in the record overwhelmingly contrary to the finding. *Koppers Co. v. United States*, 405 F.2d at 556, 559.

██ Once the Board properly rejected Hochstadt's and Grosshans' testimony, the only evidence left to support a finding of an oral interest agreement was plaintiff's five page exhibit allegedly showing a course of conduct between the parties with respect to interest. Those documents allude to several transactions between Lance and a Hong Kong corporation, Construc-

tion Services. The court concurs in the Board's conclusion that they "do not individually or collectively establish a sequence of previous conduct ... with respect to the payment of interest" between Lance and Peterson-Sharpe. The evidence in the record, therefore, is not overwhelmingly contrary to the Board's finding.

Nevertheless, plaintiff asserts that the Board must have some independent support for its denial of plaintiff's claim. Disbelief of plaintiff's witnesses is not sufficient. The cases relied on, however, hold that a trial judge may not use his disbelief of a witness to affirmatively find that the opposite of the witness' testimony is true when that evidence is required as an essential element of a party's burden of proof. *See, e.g., Seymour v. Oceanic Navigating Co.*, 453 F.2d 1185, 1191 (5th Cir.1972). Plaintiff had the burden of proof. Defendant was under no obligation to introduce evidence that there was no interest obligation when plaintiff failed to satisfy its burden. There is nevertheless substantial evidence in the record to conclude that there was no interest agreement. The written contracts between Lance and Peterson-Sharpe do not mention interest and contain integration clauses. Plaintiff's original termination claim also did not mention interest, and more recent documents claim interest at differing rates. The Board did not use its rejection of this testimony to satisfy an essential element of proof.

### CONCLUSION

The Board did not decide whether interest due this subcontractor was recoverable in a termination claim against the United States because it found that no interest agreement existed. This finding is supported by substantial evidence. Therefore, the court also does not reach the question pretermitted by the Board.

Accordingly, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. The case will be dismissed with

costs to the prevailing party. *See* 28 U.S.C. § 2412(a); RUSCC 54(d).

It is so ORDERED.