**Eugene C. JENSEN,**

v.

**The UNITED STATES.**

No. 235–82L.

United States Claims Court.

Aug. 7, 1989.

supported by affidavits and other pertinent documentation. Defendant seeks summary judgment on the following grounds: That plaintiff has not shown damages which would constitute a basis for his taking claims as to his alleged groundwater rights and as to the alleged flooding of the gravel located beneath the surface of plaintiff's property; that *res judicata* or collateral estoppel bar the assertion of any claim for a taking of groundwater rights; and, finally, on the ground that plaintiff's taking claims are barred by the statute of limitations.

Plaintiff cross-moves for summary judgment on the general ground that plaintiff has made out a case for damages as a result of the alleged takings.

For the reasons to be set forth, it is concluded that plaintiff has failed to establish a fifth amendment taking claim for the alleged damage to the gravel beneath plaintiff's land and that plaintiff's water rights taking claim is barred by the doctrines of collateral estoppel and *res judicata*. Accordingly, defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and plaintiff's complaint is hereby dismissed.

### Discussion

#### Plaintiff's Property

Plaintiff, Eugene C. Jensen, purchased the property at issue by warranty deed, dated November 3, 1969. The property, consisting of approximately 165 acres, is located in the state of Washington within the exterior bounds of the Columbia Basin Project (Project) and within the Quincy Subarea. The Project, authorized by Pub.L. No. 8, 57 Stat. 14 (1943), was constructed by the federal government to provide for the withdrawal of substantial quantities of water from the Columbia River for the irrigation of more than one million acres of arid lands in east-central Washington. Since 1952 with the coming

Ralph J. Rodamaker, Mill Creek, Washington, attorney of record, for plaintiff.

Dorothy R. Burakreis, Washington, D.C, with whom was Asst. Atty. Gen. Carol E. Dinkins, for defendant.

### OPINION

MEROW, Judge.

This case comes before the court on the parties' cross-motions for summary judgment,[1] pursuant to RUSCC 56, which are

1. The rule is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed. *See Nat'l Assn. of Gov't Employees v. Campbell,* 593 F.2d 1023 (D.C.Cir.1978).

of the first Project waters, the water table in the Project area has risen, resulting primarily through irrigation waters percolating down through the land's subsurface until commingling with naturally occurring groundwaters.

The affidavit of defendant's geological expert, Henry D. Neumann, and appended hydrological graphs, uncontroverted by plaintiff, show that by 1965, groundwater levels in the area of plaintiff's property had reached equilibrium and that subsequent to 1965, the groundwater has fluctuated between 26 and 34 feet below the surface. Defendant's affidavit further shows that when plaintiff purchased the property in 1969, area groundwaters had reached their peak levels. This, too, is uncontroverted by plaintiff.

*Gravel Claim*

Plaintiff seeks to recover damages for the alleged taking of gravel deposits located beneath the surface of his property. Plaintiff contends that defendant's operation of the Project has caused the water table to rise, inundating a bed of gravel which forms part of the subsurface of plaintiff's farm. Specifically, plaintiff asserts that the groundwaters beneath plaintiff's property have caused a hard water coating, which he calls "caliche," to form on the gravel. Defendant acknowledges the presence of this white coating, however, it is contended by defendant that the acknowledged white coating is incorrectly termed "caliche" by plaintiff. In any event, plaintiff alleges that the white residue is contaminating the gravel and causing the gravel and subsurface to turn into a "solid rock" formation. Plaintiff presents two affidavits in support of these allegations. The first affidavit, by Mr. Jensen, the plaintiff in this action, sets forth broad allegations to the effect that he is aware of the white residue phenomenon in the local area and on his own land, and that he has made observations of the residue on his property. Plaintiff has also appended to his cross-motion for summary judgment the affidavit of Dr. Mark J. Ghiorso, a geochemist affiliated with the University of Washington. A copy of the results of a water analysis performed by Dr. Ghiorso on plaintiff's well and on the adjacent gravel mine was also appended to plaintiff's pleading. Dr. Ghiorso concluded, *inter alia*, that both the waters from the adjacent gravel mine and the Jensen well are precipitating calcite and quartz which make up the white mineral formations on plaintiff's gravel.[2]

Defendant has proffered evidence which shows that the United States Bureau of Reclamation (USBR) conducted studies on the suitability of the gravel deposits in the area of plaintiff's farm in 1945. This study indicates that a white coating was found on the gravel at that time, which was prior to the general rise in groundwater levels; however, the gravel continued to be suitable for use in cement. A county gravel pit, adjacent to plaintiff's property, continues to be operated. Mr. Neumann, defendant's expert, and Chief, Geology and Groundwater Studies, Engineering and Drainage Division of the Columbia Basin Project, USBR, stated in his affidavit that the rise in the water table which resulted from the Project stabilized in 1965, prior to plaintiff's purchase of the property. He reiterated the opinion of the 1945 report that the white coating did not damage the economic value of the property and mentioned that gravel on adjacent property continued to be mined and used.

Plaintiff's expert's only rebuttal of this evidence is an allegation that the white coating had a different chemical composition than that described by the 1945 report. However, the expert did not state that the white coating affected the economic value of the gravel, or that it turned the gravel into solid rock, or that it in any other way

2. Plaintiff alleges that he discovered this white residue during drilling operations in late 1976 or early 1977. Defendant contends that the drilling occurred in 1974, and discovery of the white residue by plaintiff would have occurred in 1974 at the time of the drilling. Thus, defendant argues this taking claim, which was filed on May 10, 1982, is barred by the six year statute of limitations. 28 U.S.C. § 2501 (1982). Since defendant's motion is granted on other grounds, this contention will not be further considered.

deprived the plaintiff of the use of his property. In this regard, plaintiff has not submitted any evidence which demonstrates how, or in what way, he has been harmed by the presence of Bureau waters beneath the surface of his property. He has simply made broad statements to the effect that Project waters have caused his gravel to be coated with a white residue and to form into "solid rock," without connecting this phenomenon with demonstrable property damage. Moreover, plaintiff has not rebutted defendant's assertions that the water table had stabilized by 1965, four years prior to plaintiff's purchase of the property. Plaintiff's general allegations, including the allegation that the rise in the water table will increase the expense of any future mining of his gravel, are speculative and do not create a constitutional taking. Rather, the facts at bar suggest a mere loss of potential profit, which need not be compensated by the government. *See Deltona Corp. v. United States,* 228 Ct.Cl. 476, 488, 657 F.2d 1184, 1191 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

With respect to RUSCC 56, the moving party has the burden of showing the absence of a genuine issue as to any material fact. *Weinberger v. Hynson, Wescott & Dunning,* 412 U.S. 609, 621–22, 93 S.Ct. 2469, 2478–79, 37 L.Ed.2d 207 (1973). "On summary judgment, the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In a case where the non-moving party bears the burden of proof at trial, the moving party can meet its initial burden by showing that there is an absence of evidence in the record necessary to prove an element of the non-moving party's case.[3] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Supreme Court has stated that on a motion for summary judgment "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus, the non-moving party's substantive, evidentiary burden at trial must be considered in determining whether there is an absence of evidence in the record necessary to prove an element of the non-moving party's case.

An essential element of plaintiff's taking claim concerns the issue of whether plaintiff has suffered damages, *i.e.,* of whether he has been deprived in some way or manner of the use of his gravel by the government. Defendant has presented documentary evidence and expert testimony that the gravel has not been detrimentally effected by the presence of Bureau water under plaintiff's property which have not been specifically contradicted by plaintiff's broad and general allegations in his affidavit.[4] In a similar situation, the Court of Claims found that summary judgment was appropriate. In *Bistline v. United States,* 226 Ct.Cl. 282, 290, 640 F.2d 1270, 1275–76 (1981), the plaintiff's "broad and general statements in his affidavits were insufficient to rebut an affidavit and documents relief upon by defendant's hydrologist." *See also Hartwig v. United States,* 202 Ct.Cl. 801, 810–11, 485 F.2d 615, 620–21 (1973) (plaintiff's affidavits did not adequately support the allegations). Therefore, since plaintiff has failed to introduce specific facts regarding an essential element of his case, defendant's motion for summary judgment is granted and plaintiff's taking claim for the gravel beneath the surface of his property must be dis-

---

**3.** In this case, which involves cross-motions for summary judgment, since defendant's motion is granted, defendant is considered the moving party and plaintiff is considered the non-moving party.

**4.** In addition, as mentioned, plaintiff purchased the property in 1969, four years after the water table had stabilized, according to defendant's evidence. Consequently, plaintiff was, or should have been, on notice regarding water table levels when he purchased the property.

missed.[5]

*Water Rights Claim*

■ The Department of Ecology (DOE) is the state agency responsible for management of Washington's surface waters, which include both naturally and artificially stored groundwaters. Permits are required to appropriate public groundwater. Revised Code of Washington (RCW) § 90.44.050. Artificially stored groundwaters are obtained by declaration. RCW § 90.44.130.

On February 28, 1974, plaintiff filed an application to appropriate public groundwaters pursuant to RCW § 90.44.130. Since DOE had tentatively determined that no public groundwaters were available, plaintiff's application was not granted. The application was held for priority purposes only. Plaintiff was the 187th applicant on the priority list.[6] Plaintiff subsequently, on February 10, 1975, filed an application for use of artificially stored groundwater pursuant to chs. 173, 134 and 136 of the Washington Administrative Code (WAC). Plaintiff was issued a permit on March 17, 1975, authorizing withdrawal of a specified amount of water per year from a well to be drilled not deeper than 200 feet into the basalt formation, which would be within the SMU. The permit required applicants to enter into an agreement with the Bureau of Reclamation to pay for withdrawn water. Plaintiff entered into this required agreement, although he noted he did not recognize the Bureau's claim of ownership to the water. Plaintiff subsequently commenced drilling and pumping to aid land development. By 1978, the end of the three year period provided in the permit, plaintiff had only developed a portion of the 160 acres described in the permit. After receiving an extension to fully develop the Project, only 80 of the 160 acres of land

under the permit had been developed and utilized for crop irrigation by April of 1979. As a result, plaintiff's permit was amended to reflect the reduced acreage. Plaintiff thereafter appealed this decision to the Pollution Control Hearings Board (PCHB) in PCHB No. 79–133. During the course of the appeal, DOE agreed to process plaintiff's public groundwater application which had been held since 1974. DOE denied the application on April 3, 1980. Then, plaintiff appealed the denial by DOE of his groundwater application to the PCHB in PCHB No. 80–96. In the final order issued on June 8, 1981, the PCHB upheld the findings and conclusions of DOE. The PCHB affirmed that no public groundwater was available from Mr. Jensen's well for allocation; that the groundwater in Mr. Jensen's well is artificially stored groundwater owned by the Water and Power Resources Commission (WPRC), now the USBR, as set forth in the declaration accepted by DOE; and, that Mr. Jensen's proposed appropriation would impair existing rights and result in preferential treatment, inimical to the statutory priority scheme (RCW 90.03.010; RCW 90.03.340). Consequently, it was concluded that Mr. Jensen's "right" to public groundwater never rose above an application for it of a certain priority date. The PCHB further found that Mr. Jensen's appeal, insofar as it attempted to litigate the DOE ruling granting the WPRC's claim to artificially stored groundwater (DOE Docket No. 74–772, dated January 8, 1975), was not timely.

Plaintiff thereafter filed a petition for judicial review in the Superior Court for King County (Dkt. No. 81–2–09365–5). The state court, on April 15, 1983, upheld the administrative denial of plaintiff's permit to withdraw public groundwater. A subse-

---

5. At most, plaintiff's allegations relate to a claim for consequential damages, which are not compensable under the fifth amendment. *Cloverport Sand & Gravel Co. v. United States,* 6 Cl.Ct. 178, 201 (1984); *Berenholz v. United States,* 1 Cl.Ct. 620, 626 (1982), *aff'd,* 723 F.2d 68 (Fed. Cir.1983).

6. With the issuance of WAC 173–134 on January 8, 1975, DOE adopted the finding that the public groundwaters had been fully appropriated in

the Shallow Management Unit (SMU) of the Quincy Subarea and closed the Deep Management Unit to new appropriations, pending additional studies. Under WAC 173–134, artificially stored and naturally occurring groundwaters were described as being commingled, with such commingling extending to 200 feet into the basalt. The 200 foot zone was denominated as the SMU.

quent *en banc* decision by the Supreme Court of the state of Washington upheld the Superior Court's denial of plaintiff's application to withdraw public groundwater, thus, affirming DOE's decision. This decision also rejected plaintiff's argument that artificially stored groundwater should be included in the DOE's quantification of public groundwater and thus subject to allocation.[7] *Jensen v. Dept. of Ecology, et al.*, 102 Wash.2d 109, 685 P.2d 1068 (1984).

Plaintiff contends herein that the government is liable under the fifth amendment for the taking of groundwater rights appurtenant to his land.[8] The government argues that plaintiff's claims relating to water rights are barred by the doctrines of *res judicata* and/or collateral estoppel.

The question presented by defendant's motion is whether, in light of the above-described facts, the doctrines of *res judicata* or collateral estoppel serve to preclude this court's consideration of plaintiff's water rights taking claim.

The doctrine of *res judicata* precludes relitigation between the same parties, or their privies, of the same claim which has previously been finally decided on the merits. *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *see also Mesa Ranch Partnership v. United States*, 2 Cl.Ct. 700 at 706 (1983); *Bayshore Resources Co. v. United States*, 2 Cl.Ct. 625 at 635 (1983); *Sterner v. United States*, 2 Cl.Ct. 253 (1983). A finding of *res judicata* requires that: (1) the court's prior decision must be a valid, final judgment; (2) the suit before the court must involve the same claim or cause

of action as in the prior decision; (3) the prior decision must have been made on the merits of the case; and (4) the same parties or those in privy with them must be involved in both cases. *See Hooker v. Klein*, 573 F.2d 1360, 1367 (9th Cir.1978), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *Forest Village Apartments, Inc. v. United States*, 178 Ct.Cl. 490, 371 F.2d 500 (1967); *Bander v. United States*, 161 Ct.Cl. 475 (1963); *Rogers v. United States*, 15 Cl.Ct. 692, 696 (1988).

The doctrine of collateral estoppel provides that once an issue is actually litigated and necessarily determined, that determination is conclusive in subsequent lawsuits based on a different cause of action, but involving a party or privy to the prior litigation. *See Montana v. United States, supra*, 440 U.S. at 153–54, 99 S.Ct. at 973–74, 59 L.Ed.2d at 217. In order for this court to apply the doctrine of collateral estoppel, the following factual elements must be present: (1) the issue must be identical to an issue decided in the prior litigation; (2) the issue was actually litigated in the prior action; (3) resolution of that issue was essential to a final judgment in that action; and (4) the plaintiff had a full and fair opportunity to litigate the issue in the prior action. *See Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983); *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed. Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984); *Golder v. United States*, 15 Cl.Ct. 513, 517 (1988).

It is concluded, from the briefs submitted by the parties, setting forth the facts leading to the filing of the instant suit, and from the documentary evidence submitted

7. The Bureau's ownership of artificially stored groundwater was recognized by DOE pursuant to RCW 90.44.130, on January 8, 1975 (Dkt. No. 74–772). On appeal, the PCHB upheld DOE's order in *Van Holst v. State of Washington*, PCHB No. 798–A (June 11, 1976).

8. In essence, plaintiff claims that he has been denied the use of the water beneath the surface of his land because, in order to have the use of such water, he must apply to appropriate it and pay the Bureau. This situation was created by the state of Washington's regulatory scheme pursuant to which his application for an alloca-

tion of public groundwater was denied and through the state's acceptance of the Bureau's claim to artificially stored groundwater in the SMU. Thus, in order to be able to use any of the artificially stored groundwater, he had to pay the government. Consequently, plaintiff argues he has been denied both his riparian and appropriative rights to the use of water appurtenant to his land. Therefore, he contends the government has taken his property and, pursuant to the fifth amendment, he has a right to be compensated therefor.

in conjunction with the cross-motions for summary judgment, that plaintiff is barred from relitigating his rights to public groundwater and artificially stored groundwater under the doctrines of collateral estoppel and *res judicata.* Formal hearings were held both in administrative forums and judicial forums in which plaintiff was seeking a favorable resolution regarding his rights to public groundwater and to artificially stored groundwater owned by the WPRC.

In sum, plaintiff has argued before other tribunals and herein that, under Washington state law, he has riparian and appropriative water rights which were taken by the government. Plaintiff has contended that, besides being a riparian owner, he was the first person ready to put the water to a beneficial use. In *United States v. Ahtanum Irrigation District,* 330 F.2d 897, 904 (9th Cir.1964), *cert. denied,* 381 U.S. 924, 85 S.Ct. 1558, 1559, 14 L.Ed.2d 683 (1965), the court stated:

> It is plain that under Washington law water rights could be acquired either by appropriation or by virtue of ownership of riparian lands. To perfect an appropriation * * * the user must apply the water to a beneficial use with intent to appropriate.

The court went on to find that:

> For purposes of our decision it is of no consequence whether the rights which are for adjudication here are appropriative rights or riparian rights. The settled law in the State of Washington is that riparian rights, their existence and continuation, are, like appropriative rights, dependent upon beneficial use.

330 F.2d at 904. Consequently, the right to use water does not depend on Mr. Jensen's ownership of underlying or appurtenant lands, as plaintiff seems to contend with respect to his riparian water rights claim. As the court stated, the right to use water depends on appropriation for a particular use, *i.e.,* the first person to put water to a beneficial use is entitled to that water as long as the use continues, to the exclusion of subsequent users. Priority is established chronologically, based on the time

the various appropriators first put the water to use. In the Washington Supreme Court decision, the court determined that plaintiff was mistaken in his argument that his rights to the artificially stored groundwater he was withdrawing vested before the Bureau's rights, because his 1974 application preceded the DOE's 1975 recognition of the Bureau's ownership. The court determined, as follows:

> First, * * * a permit is required for withdrawal of public groundwater. * * * [Mr. Jensen's] right to withdraw public groundwater never arose because he was never granted a permit. Had a permit been granted, his right of withdrawal would relate back to the date of his application. RCW 90.03.340. A permit not having been granted, his sole right was to his place in line. * * * Second, * * * we note that the Bureau's 1973 declaration preceded [Mr. Jensen's] 1974 application. Third, the DOE's acceptance of the Bureau's declaration was a recognition of the Bureau's preexisting rights in conformance with RCW 90.44.-130. * * * Unless abandoned or forfeited, artificially stored groundwater is not public water. *See* RCW 90.44.040.

Plaintiff's arguments that the Bureau's water was either abandoned, or else that such water lost its identity by virtue of its commingling with naturally occurring groundwater and thereby became public groundwater available for appropriation, were also rejected on the bases of the PCHB record in No. 80–96 and case and statutory law. Plaintiff had also contended ·that he had been withdrawing public groundwater, not Bureau water, because the DOE's recognition of the Bureau's artificially stored water was limited to a horizontal depth, and his well is below that depth. The court determined that, although water withdrawn at the depth of Mr. Jensen's well would have been public groundwater prior to the importation of project water, subsequent to the project's inception and the consequent increase in the water table, it had not been possible to distinguish water other than by volume. Since water is measured by volume, and since the DOE found that public groundwa-

ter is fully appropriated by volume, Mr. Jensen was determined to be withdrawing Bureau water. The court also rejected his argument, as immaterial and unsupported, that he was denied due process because he was not given notice regarding the issuance of WAC regulations, which he claims affected his public groundwater rights. *Jensen v. DOE,* 102 Wash.2d 109, 685 P.2d 1068, 1070–74 (1984).

Thus, the record indicates that the same issues and claims were fully litigated on the merits in these previous actions and that resolution of the ownership issues were essential to final judgment in these prior actions. In addition, the Washington Supreme Court decision has not been challenged by plaintiff on the grounds of validity or finality; nor does plaintiff challenge that the same parties or their privies are involved in these suits. Accordingly, since, based on settled case law, plaintiff cannot assert any ownership rights necessary to show a property interest as a basis for his water taking claim, there can be no genuine issue of material fact before this court regarding a just compensation claim pursuant to the fifth amendment and the government is entitled to judgment as a matter of law. *State of Ill. v. United States,* 15 Cl.Ct. 399, 410 (1988); *see also Pacific Far East Line, Inc. v. United States,* 206 Ct.Cl. 378, 385, 513 F.2d 1355, 1359 (1975); *Royal Indemnity Co. v. United States,* 178 Ct.Cl. 46, 51–52, 371 F.2d 462, 465 (1967), *cert. denied,* 389 U.S. 833, 88 S.Ct. 33, 19 L.Ed.2d 93 (1967).

### Conclusion

It is noted that just compensation cases are generally fact intensive and, thus, are less appropriate for resolution by grants of summary judgment. However, summary judgment plays a vital role in the judicial process and may serve a useful purpose in an appropriate just compensation case. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983); *Singleton v. United States,* 6 Cl.Ct. 156, 166 (1984). It is concluded that this case is an appropriate one in which to grant defendant's motion for summary judgment. Accordingly,

it is ORDERED that plaintiff's complaint be dismissed. No costs.